1   STEVEN SCHORR
    ATTORNEY AND COUNSELOR
2   P.O. BOX 910496
    SAN DIEGO, CA 92191-0496
3   (858) 794-5403
    sschorr@san.rr.com
4   STATE BAR NO. 126312

5   Attorney for Petitioner
    Anthony Daniel Gonzales

6

**FILED**

08 JUL 14 AM 11:58

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

RMW

7               UNITED STATES DISTRICT COURT

8             NORTHERN DISTRICT OF CALIFORNIA

9
    ANTHONY DANIEL GONZALES,      CV    08    Civil No. _3378_
10                        Petitioner    )
11                                      )
                 v.                     )
12                                      )
    JAMES E. TILTON, SECRETARY,         )
13                                      )
    CALIFORNIA DEPARTMENT OF            )
14                                      )
    CORRECTIONS                         )
15                        Respondent    )
16                      and             )
17                                      )
    EDMUND G. BROWN                     )
18                                      )
    THE ATTORNEY GENERAL OF THE STATE   )
19                                      )
    OF CALIFORNIA,                      )
20                                      )
                 Additional Respondent  )
21

22

23        MEMORANDUM OF POINTS AND AUTHORITIES

24   IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

25

26

27
    Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
28   Corpus                        1

# TABLE OF CONTENTS

JURISDICTION                                                                        1

STATEMENT OF THE CASE                                                               1

STATEMENT OF FACTS                                                                  3

    THE DEFENSE                                                  4

    MATTERS OUTSIDE OF THE RECORD                                6

ARGUMENT                                                                           10

I.   THE CALIFORNIA COURT OF APPEAL UNREASONABLY APPLIED CLEARLY ESTABLISHED FEDERAL LAW WHEN IT REJECTED PETITIONER'S CONTENTION THAT TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO SUPPORT HIS TESTIMONY THAT HE DEFENDED HIMSELF FROM A MOB ATTACK BY OPENING A FOLDING KNIFE WITH ONE HAND WHILE UNDER A PILE OF ATTACKERS EITHER BY ASKING HIM TO DEMONSTRATE THE KNIFE'S OPERATION OR BY CONSULTING AND CALLING AS A WITNESS AN EXPERT ON KNIVES WHO COULD HAVE PROVIDED SUCH A DEMONSTRATION AND EDUCATED THE JURY ON THE KNIFE'S DESIGN FEATURES                                         10

   A. Introduction                                                    10

   B. Federal Standard of Review                                      11

   C. "Clearly Established" Legal Principles Governing This Issue      12

   D. Federal Error: Counsel's Failure To Consult An Expert           13

II.  THE CALIFORNIA COURT OF APPEAL UNREASONABLY APPLIED CLEARLY ESTABLISHED FEDERAL LAW WHEN IT REJECTED PETITIONER'S CONTENTION THAT TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO OBJECT TO THE COURT'S DECISION TO PLACE THE KNIFE IN SEALED, PRESSURIZED PACKAGING BEFORE ALLOWING IT INTO THE JURY ROOM AS AN EXHIBIT                                                   24

   A. Procedural Background                                           24

   B. Federal Error                                                   25

Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus

1   III.    THE CALIFORNIA COURT OF APPEAL UNREASONABLY
        APPLIED CLEARLY ESTABLISHED FEDERAL LAW WHEN IT
2       REJECTED PETITIONER'S CONTENTION THAT TRIAL COUNSEL
        PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT
3       TO THE PROSECUTORIAL MISCONDUCT WHICH OCCURRED
        WHEN THE PROSECUTOR ARGUED FACTS OUTSIDE THE
4       EVIDENCE, TO WIT, THAT IT WAS IMPOSSIBLE TO OPEN WITH
        ONE HAND THE FOLDING KNIFE INVOLVED IN THE HOMICIDE
5                                                                       31

6   IV.    COUNSEL'S INEFFECTIVENESS PREJUDICED PETITIONER        39

7   CONCLUSION                                                   52

8   DECLARATION OF STEVEN SCHORR                                 53

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Arnold v. Runnels*, 421 F.3d. 859 (9th Cir. 2005)                              39

*Beasley v. United States*, 491 F.2d 687 (6th Cir 1974)                         19

*Berger v. United States*, 295 U.S. 78 [79 L.Ed. 1314, 55 S.Ct. 629] (1935)       35

*Brecht v. Abrahamson*, 507 U.S. 619 [123 L.Ed.2d 353, 113 S.Ct. 1710] (1993)     39

*Brooks v. Francis*, 716 F.2d 780 (11th Cir. 1983)                              36

*Burger v. Kemp*, 483 U.S. 776 [97 L.Ed.2d 638, 107 S.Ct. 3114] (1987)        13, 30

*Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1998)                       13, 20, 21

*Chapman v. California*, 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] (1967)        37

*Delgado v. Lewis*, 223 F.3d  976 (9th Cir. 2000)                               11

*Donnelly v. DeChristoforo*, 416 U.S. 637 [40 L.Ed.2d 431, 94 S.Ct. 1868] (1974)  35

*Early v. Packer*,  537 U.S. 3 [154 L.Ed.2d 263, 86 S.Ct. 362](2002)              11

*Higgins v. Los Angeles Gas &Electric Co.*, 159 Cal. 651 (1911)               26-28

*Hoffman v. Arave*, 236 F.3d 523 (9th Cir. 2006)                                39

*Kotteakos v. United States*,  328 U.S. 750 [90 L.Ed.1557, 66 S.Ct. 1239] (1946)  39

*People v. Alverson*, 60 Cal.2d 803  (1964)                                       35

*People v. Bain*, 5 Cal.3d 839 (1971)                                            38

*People v. Baldine*, 94 Cal.App.4th 773 (2001)                                   26

*People v. Barrett*, 22 Cal.App. 780 (1913)                                      26

*People v. Bell*, 49 Cal.3d 502  (1989)                                          35

*People v. Bogle*, 41 Cal.App.4th 770  (1995)                                 26-28

*People v. Bolton*, 23 Cal.3d 208 (1979)                                         37

*People v. Clair*, 2 Cal.4th 629 (1992)                                          38

*People v. Cummings*, 4 Cal.4th 1233 (1993)                                      38

*People v. Cumpian*, 1 Cal.App.4th 307 (1991)                                           27, 28

*People v. Duvall*, 9 Cal.4th 464 (1995)                                                      10

*People v. Haskett*, 30 Cal.3d 841 (1982)                                                    36

*People v. Hawthorne*, 4 Cal.4th 43 (1992)                                                   38

*People v. Herring*, 20 Cal.App.4th 1066 (1993)                                        33, 37, 38

*People v. Hill*, 17 Cal.4th 800 (1998)                                                      33

*People v. Kelly*, 75 Cal.App.3d 672 (1977)                                                  35

*People v. Mattson*, 50 Cal.3d 826 (1990)                                                  29, 32

*People v. Montiel*, 5 Cal.4th 877 (1994)                                                    33

*People v. Morales*, 25 Cal.4th 34 (2001)                                                    35

*People v. Price*, 1 Cal.4th 324 (1991)                                                      35

*People v. Santamaria*, 229 Cal.App.3d 269 (1991)                                            40

*People v. Strickland*, 11 Cal.3d 946 (1974)                                                 36

*People v. Talle*, 111 Cal.App.2d 650 (1952)                                                 35

*People v. Watson*, 46 Cal.2d 818 (1956)                                                     38

*People v. Wiley*, 57 Cal.App.3d 149 (1976)                                                  36

*People v. Williams*, 44 Cal.3d 883 (1988)                                                   40

*Price v. Vincent*, 538 U.S. 634 [155 L.Ed.2d 877, 123 S.Ct. 1848] (2003)                    11

*Puritan Ins. Co. v. Superior Court*, 171 Cal.App.3d 877 (1985)                              41

*Raley v. Ylst*, 444 F.3d 1085 (9th Cir. 2006)                                             13

*Saunders v. Ratelle*, 21 F.3d 1446 (9th Cir. 1994)                                      13, 18

*Siripongs v. Calderon*, 35 F.3d 1308 (9th Cir. 1994)                                      21

*Strickland v. Washington*, 466 U.S. 668 [80 L.Ed.2d 674, 104 S.Ct. 2052] (1984)    12-14, 36, 39, 40

*United States v. Avery*, 717 F.2d 1020 (6th Cir. 1983)                                    27

*United States v. Azubike*, 504 F.3d 30 (1st Cir. 2007)                                    32

Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus

*United States v. Mastrangelo*, 172 F.3d 288 (3rd Cir. 1999)      36, 37

*United States v. Tucker*, 716 F.2d 576 (9th Cir. 1983)      13, 19, 22, 23

*United States v. Watson*, 171 F.3d 695 (D.C. Cir. 1999)      35

*Wiggins v. Smith*,  539 U.S. 510 [156 L.Ed.2d 471, 123 S.Ct. 2527] (2003)      12, 13

*Williams v. Taylor*,  529 U.S. 362 [146 L.Ed.2d 389, 120 S.Ct. 1495]  (2000)      11, 12

**CONSTITUTIONS AND STATUTES**      PAGE

**California Penal Code section 187,  subd. (a)**      1

**United States Constitution, Amendment VI**      1, 12, 14

**United States Constitution, Amendment XIV**      14

**28 United States Code section 2254**      1

**28 United States Code section 2254, subdivision (d)**      11

Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus      vi

1

2

3

**JURISDICTION**

· This petition for writ of habeas corpus is brought pursuant to the provisions of 28 U.S.C. section 2254.

4

**STATEMENT OF THE CASE**

5

6

7

8

An information charged petitioner Anthony Daniel Gonzales and co-defendant Moses Joe Escamilla with one count of murder. Cal. Pen. Code, sec. 187 subd. (a). It further alleged that Gonzales had personally used a deadly and dangerous weapon, a knife, Cal. Pen. Code sec. 12022, subd. (b)(1), in the commission of that offense. (3 CT 387.)

9

10

11

Gonzales pleaded not guilty to the charged offense. (3 CT 390.) A jury found him guilty of second degree murder and found the enhancement allegation true. (4 CT 698; 10 RT 1616.) It acquitted Escamilla. (10 RT 1616-1617.)

12

13

14

The court sentenced Gonzales to state prison for a term of 15 years to life as to count one and a consecutive term of one year for the weapon use enhancement. (4 CT 758-759; 11 RT 1652.)

15

16

17

18

19

20

21

22

23

24

25

Gonzales appealed (Cal. Ct. Of Appeal No. H029399) and filed a related petition for writ of habeas corpus. (Cal. Ct. Of Appeal No. H031002.) In the writ petition, he contended, that he was deprived of his Sixth Amendment right to counsel because his trial attorney (1) failed to provide crucial support for his testimony either by asking him to demonstrate that the folding knife he used could be opened with one hand in accordance with his claim to that effect during his testimony or by presenting an expert witness on knives (HAB PT 41-55); (2) failed to object to the trial court's decision to place the knife in sealed, pressurized packaging before allowing it into the jury room as an exhibit and thereby precluding the jury from testing if it could be opened with one hand (HAB PT 56-78); and (3) failed to object when the prosecutor committed misconduct by arguing facts outside the evidence and asserting it was impossible to open the folding knife with one hand. (AM HAB PT 20-29.)

26

27

28

Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus                                    1

1    The California Court of Appeal, Sixth Appellate District, summarily denied the writ

2    petition in an order filed on May 23, 2007.[1]

3    On June 25, 2007, Gonzales filed a petition for review with the California Supreme

4    Court (Cal. Supreme Ct. No. S153789), seeking review of each of the aforementioned issues.

5    On August 29, 2007, the Supreme Court denied the  petition for review.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

25    [1] The court's order denying the petition for writ of habeas corpus is hereafter cited as "5/23/07

26    Order."

27    Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas

28    Corpus                                2

1

## STATEMENT OF FACTS

2   About 60 to 70 people attended a party at Scott Largent's home to celebrate his 27th

3   birthday. (4 RT 293-294, 297-298.) Most of the guests were his friends from high school and

4   work. (4 RT 297-298.) Johnny Morales knew a number of the guests. He invited Moses

5   Escamilla and Escamilla's younger cousin, 19-year-old Anthony Gonzales, to the party. (7

6   RT 969; 9 RT 1298-1300.) Neither Gonzales nor Escamilla knew anyone there or were even

7   aware they were attending a birthday party. (9 RT 1299, 1364.)

8   During the party, Gonzales flirted in a friendly way with a number of women,

9   including Largent's girlfriend, Carol Holmboe. (2 RT 98-99, 105, 107, 126, 133-135, 154;

10  4 RT 446, 448-451, 453-455;5 RT 688-689, 695.) Largent approached and said she was his

11  girlfriend. (2 RT 109, 139; 7 RT 970-971, 1019-1020.) Extending his hand to shake

12  Largent's, Gonzales said, "No problem, it's all good," but Largent got mad, refused the

13  offered hand and called him a bitch. (7 RT 971, 1020-1021.) Gonzales hit him in the eye, and

14  they started fighting. (2 RT 109-110, 140; see 4 RT 309.) Some people pulled them apart and

15  tried to get Gonzales to leave. (2 RT 157-158.) At least three people pushed Gonzales toward

16  an exit gate by the side yard, and he pushed back. (2 RT 141-143, 147, 168-169.)

17  By the gate, Gonzales exchanged shouts with a crowd of about ten people led by

18  David Quiroz. (4 RT 460-461, 468-469, 497.) A large fight involving about 15 to 30 people

19  then broke out in the driveway in front of the gate. (2 RT 113-115, 143; 4 RT 465.)

20  Justin Guinn saw Gonzales and Escamilla punching Quiroz. (5 RT 588-591, 604, 611,

21  614.) Guinn jumped on Gonzales, and Danny Ramirez jumped on Escamilla, pulling the co-

22  defendants off Quiroz, who had fallen down into a bush. (4 RT 512; 5 RT 591-593.) Guinn

23  punched Gonzales four or five times in the face then let him go when Gonzales said he would

24  leave. (5 RT 591-594.)

25

26

27

1    Dan Rollis saw Guinn on top of Gonzales, pounding him in the head quite a few

2  times. (5 RT 643-644.) Largent also hit Gonzales in the head a few  times before the latter

3  managed to run off. (4 RT 327-328, 332-334, 364.)

4    Quiroz died at the scene from multiple stab wounds inflicted by Gonzales' folding

5  knife, which was found in the bushes. (3 RT 247; 4 RT 281-284, 286-287, 377, 399; Peo.

6  Exh. 16.) He had suffered eight stab wounds, including three fatal or potentially fatal wounds

7  to the right posterior of the neck, the abdomen and the left lower back. (3 RT 236-246.) None

8  of the wounds were incised or slashing cuts, i.e., ones that are longer than they are deep. (3

9  RT 249.) He had not suffered hand injuries of the type which might occur in a fist fight or

10  which would suggest he had been trying to ward off an attacker; however, he would not have

11  had any wounds to his hands if he had been holding someone else down with them. (3 RT

12  230-231, 248-249, 251.)

13    **THE DEFENSE**

14    Interviewed on two occasions after the incident, Steve Kenzler, a party guest, told

15  police that Quiroz started punching Gonzales and then five to six people jumped on Gonzales

16  in a big dog pile and were kicking and hitting him. (5 RT 756-757, 759-760, 763-764, 766,

17  768-769; 8 RT 1136-1138; 3 CT 448-451.) At trial, he denied seeing people attack Gonzales

18  and claimed he had just assumed that was what happened because he had heard that Quiroz

19  started the fight. (5 RT 774-776.)

20    On the morning of the incident, Jason Sicklesteel told police he had also seen a pile

21  of people. (7 RT 950-952.) He testified at trial that he did not see a pile, but he admitted his

22  memory was fresher when he gave the statement. (7 RT 951.)

23    From a vantage point in the rear of the backyard, Justin Thomas did not have a clear

24  view of the fighting when it broke out, but he went out to the driveway and saw seven or

25  eight people clustered in a fight which had probably been going on for about 15 to 20

26  seconds. (6 RT 829-839.) After assessing the situation, he tried to break up the melee by

27

28  Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
Corpus                                   4

1   wedging himself between Gonzales and the group of people who were fighting with him. (6

2   RT 831-832.) He grabbed Gonzales because it appeared the latter had been hit a few times

3   and the fight was directed towards him. (6 RT 832-833.)

4          Gonzales testified that he was having a good time when Largent approached. They

5   exchanged aggressive words, and Gonzales pushed him away. (7 RT 970-972, 1021-1022.)

6   Largent came back fast with either a swing or push, and Gonzales responded with a swing

7   which apparently caught Largent in the eye. (7 RT 972, 1022-1023.) After people pulled

8   them apart, a group of about 15 people were yelling insults at Gonzales and Escamilla, who

9   had stepped to his side. (7 RT 973-975, 1023, 1042; see 9 RT 1309-1310.)

10          Once Morales joined Gonzales and Escamilla, the trio were staring to leave when a

11  group of people came toward them and attacked Gonzales, all coming at him at once. (7 RT

12  976-977, 1045, 1047-1049; 9 RT 1310-1312.) At the front of the group, Quiroz threw the

13  first punch. (7 RT 978.) Staggered, Gonzales tried to swing back, but he was getting rushed

14  from the front and the side pretty quickly. (7 RT 978.) Pushed onto his back into a bush, he

15  was getting pounded by four to six guys who were much bigger than him and all over him.

16  (7 RT 978, 1049-1050; 9 RT 1314.) He started to panic. Fearing for his life, he pulled a knife

17  from his right pocket and somehow managed to open it with one hand by using a knob on the

18  blade to push it open with his thumb. (7 RT 979-980, 1041, 1049-1050, 1094; 8 RT 1133.)

19  He then started swinging it, got somebody at least a couple of times and was able to stop his

20  attackers from approaching. (7 RT 979-980, 983, 1049-1051, 1076-1078.) Although the knife

21  got knocked out of his hand, he spotted an opening and squirmed out from under the pile.

22  (7 RT 980, 1051.)

23          According to Escamilla, Quiroz tackled or wrestled Gonzales to the ground, causing

24  him to fall on his back into a bush. (9 RT 1313-1314.) Four to six other men behind Quiroz

25  moved in very quickly after that. (9 RT 1314.)

26  ///

27
    Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
28  Corpus                                          5

**MATTERS OUTSIDE OF THE RECORD**

Gonzales' trial counsel, Chris Mattison, knew he was planning to testify at trial and that he would testify that he had removed a folding knife from his pants pocket, opened it with one hand and used it in self-defense to ward off a mob of men who were on top of him, kicking and hitting him. (Declaration of Chris Mattison, p.1, par. 3; attached hereto as Exhibit A and hereafter cited as "Exh. A.") Despite such knowledge, she did not ask him at any point during his testimony to demonstrate to the jury how it was possible for him to have opened his knife with one hand. (Exh. A, p.2, par. 4.) This omission was an oversight on her part and not a trial tactic. (Exh. A, p.2, par. 4.)

During a trial recess held the day after Gonzales testified, Mattison informally mentioned to the court off the record that she wanted the knife, which had been marked as an exhibit, to go into the jury room during deliberations so the jury would have an opportunity, if it wished, to examine it and test if it could be opened with one hand by pushing on the "roll-up" knob in the manner described by Gonzales. (Exh. A, p.2, par. 5; see Augmented Clerk's Transcript ("ACT") 2.)[2]

When the court took the bench following the recess, it announced to the jury that it would include the knife with other exhibits sent back to the jury room but would have it placed in pressure-sealed packaging. (8 RT 1209-1210; see Exh. A, p.2, par. 6.) Mattison did not object to the court's ruling or seek reconsideration of it. (Exh. A, p.2, par. 6.) She did not have any tactical reason for refraining from objecting or seeking reconsideration;

---

[2]    In the proceedings on appeal in state court, the Court of Appeal granted Appellant's Application For Permission To Prepare And File Settled Statement. (Court's Order of April 13, 2006.) The "Court Order Re: Settled Statement Hearing," prepared by the trial court in lieu of a settled statement (hereafter referred to as the "Settled Statement Order"), states that petitioner's trial counsel relied on her recollection as stated in the "Declaration Of Trial Counsel" which was attached to said application. (See ACT 2.) The Settled Statement Order further reflects that neither the deputy district attorney nor the trial court had any recollection of any discussion regarding presentation of the knife to the jury. (ACT 2.)

Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus                                                   6

1  however, she believed at the time that the court had already decided the issue and that further

2  objection or request for reconsideration would be futile. (Exh. A, p.2, par. 6.)

3      Only after the trial had concluded did it occur to Mattison that she could have

4  consulted and called as a witness an expert on knives to explain and demonstrate to the jury

5  how the roll-up knob worked and how it would enable a person to open the knife with one

6  hand. (Exh. A, p.2, par. 7.) Had she considered this option, she would have pursued it since

7  she did not have any tactical reasons for not doing so. (Exh. A, p.2, par. 7.)

8      Alternatively, even if the court had denied funding for an expert, Mattison realized

9  post-trial that she could have asked her investigator, John Vegas, to obtain the identical make

10  and model of the knife which Gonzales had used during the incident so that he could

11  demonstrate the operation of the roll-up knob. (Exh. A, p.2, par. 8.) She did not have a

12  tactical reason for failing to prepare Vegas to testify in this manner. (Exh. A, p.2, par. 8.)

13      Vicki Firstman, a staff attorney for the Sixth District Appellate Program, went to the

14  exhibit room of the Santa Clara County Superior Court to examine the knife, which is

15  presently retained as evidence there, and determine if it could be opened with one hand.

16  (Declaration of Vicki Firstman, pp. 1-2, pars. 1, 4; attached hereto as Exhibit B and hereafter

17  cited as "Exh. B.") She took several photographs of the knife, which was in an open position

18  and enclosed in sealed plastic packaging. (Exh. B, pp. 1-2, pars. 5, 7.)  She tried to

19  manipulate the knife within the packaging, but it appeared that the blade was locked in an

20  open position. (Exh. B, p. 2, par. 7.)  She could not easily move the knife within the

21  packaging and could not determine, based on her examination of the knife, whether or not

22  someone could have opened it with one hand. (Exh. B, p. 2, pars. 7-8.)

23      Bernard Levine, an expert on knives who has authored ten books and more than 500

24  articles on the subject and has testified about it approximately 30 times in both state and

25  federal court, examined six photographs of the knife. (Declaration of Bernard Levine, pp. 1-

26  2, pars. 1-2; attached hereto as Exhibit C and hereafter cited as "Exh. C.") He studied four

27
28  Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
    Corpus                                          7

1    snapshots taken by Firstman and depicting it as it presently appears in the sealed packaging,

2    and two photographs which are date stamped May 24, 2004, the day after the incident at issue

3    herein, and which appear to depict the knife as it appeared when it was collected as evidence.

4    (Exh. C, p. 2, par. 2.) Based on this examination, Levine concluded that it is possible to open

5    the knife with one hand by using the "thumb stud," a small, projecting metal knob near the

6    base of the knife. (Exh. C, p. 2, pars. 3-4.) When the knife is closed and gripped in the user's

7    right hand, the thumb stud is conveniently located in a position which enables the user to

8    place the tip of his thumb on the stud. It is then a simple matter to pivot the blade open by

9    pushing laterally with the thumb. (Exh. C, p. 3, par. 4.)

10    At various locations, such as knife shops and knife shows, Levine has observed

11    "laypersons" encountering certain knife novelties, such as thumb studs.  (Exh. C, p. 3, par.

12    5.) People vary in their ability to grasp the use and function of the thumb stud. (Exh. C, p.

13    3, par. 5.) Even those who do so immediately usually require some practice to use it smoothly

14    and confidently; others, perhaps a majority, are unable to figure out the mechanism on their

15    own. (Exh. C, p. 3, par. 5.) Some do not notice the thumb stud or realize it has a

16    function.(Exh. C, p. 3, par. 5.)  Such persons typically need help from someone already

17    familiar with this type of knife, or from printed diagrams or instructions provided by

18    manufacturers, in order to figure out how to open the knife blade using one hand. (Exh. C,

19    p. 3, par. 6.) Laypersons also may experience difficulty operating the locking liner

20    mechanism and often cannot figure out how to unlock and close the blade without help from

21    someone experienced with knives. (Exh. C, pp. 3-4, par. 7.)

22    After reading Levine's declaration, Firstman realized her lack of experience with

23    knives made her incapable of determining whether the knife could be opened with one hand

24    absent the assistance of an expert or someone familiar with the knife. (Exh. B, p. 2, par. 9.)

25    She neither recognized the presence or purpose of the thumb stud nor had any idea how to

26    unlock and close the blade in order to attempt to re-open it.  (Exh. B, p. 2, par. 9.) Because

27

28    Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
     Corpus                                         8

1  of her unfamiliarity with the locking liner and thumb stud and the additional difficulty of

2  handling the knife inside the sealed packaging, she left the exhibit room "having no inkling

3  whether the knife could be opened with one hand." (Exh. B, p. 2, par. 9.)

4      Without directly examining and handling the knife in the sealed plastic packaging,

5  Levine could not determine if it would be possible to unlock and close the blade, in order to

6  test if it could be opened with one hand, or if either the bag or dried blood, which he

7  suspected would be inside the knife based on observations of it on the outside of the knife,

8  would prevent such testing. (Exh. C, p. 4, par. 8.) Dried blood in the mechanism might

9  prevent the blade from moving at all while the slipperiness of the plastic bag might impede

10  closing and re-opening the blade, particularly if one tried to open it with one hand using the

11  thumb stud. (Exh. C, p. 4, par. 8.) If one could not close and then re-open the blade, a person

12  could not possibly determine if the knife could be opened with one hand as it was designed

13  to open. (Exh. C, p. 4, par. 8.) Having to handle the knife inside the bag would only

14  compound the difficulties of persons unfamiliar with the locking liner and thumb stud

15  mechanisms. (Exh. C, p. 4, par. 8.)

16

17

18

19

20

21

22

23

24

25

26

27

28

# ARGUMENT

## I.

**THE CALIFORNIA COURT OF APPEAL UNREASONABLY APPLIED CLEARLY ESTABLISHED FEDERAL LAW WHEN IT REJECTED PETITIONER'S CONTENTION THAT TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO SUPPORT HIS TESTIMONY THAT HE DEFENDED HIMSELF FROM A MOB ATTACK BY OPENING A FOLDING KNIFE WITH ONE HAND WHILE UNDER A PILE OF ATTACKERS EITHER BY ASKING HIM TO DEMONSTRATE THE KNIFE'S OPERATION OR BY CONSULTING AND CALLING AS A WITNESS AN EXPERT ON KNIVES WHO COULD HAVE PROVIDED SUCH A DEMONSTRATION AND EDUCATED THE JURY ON THE KNIFE'S DESIGN FEATURES**

### A. Introduction

Petitioner Gonzales contended in his state petition for writ of habeas corpus that his trial counsel's inadequate preparation with respect to his testimonial claim that he opened a folding knife with one hand and used it in self- defense resulted in the provision of constitutionally defective representation. In three related contentions, he asserted that counsel had: (1) failed to provide crucial support for his testimony either by asking him to demonstrate that the folding knife he used could be opened with one hand or by presenting an expert witness on knives (HAB PT 41-55); (2) failed to object to the trial court's decision to place the knife in sealed, pressurized packaging which prevented the jury from testing if it could be opened with one hand (HAB PT 56-78); and (3) failed to object when the prosecutor argued facts outside the evidence and asserted it was impossible to open the folding knife with one hand. (AM HAB PT 20-29.)

The Court of Appeal summarily denied the petition. (5/23/07 Order.) Under California law, such a ruling reflects a finding that petitioner's assertions failed to state a prima facie case for relief. *People v. Duvall*, 9 Cal.4th 464, 475 (1995).

///

///

**B. Federal Standard of Review**

In light of the state appellate court's rejection of his claims, it is incumbent upon petitioner to persuade this Court that he is entitled to habeas corpus relief by showing that the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. sec. 2254, subd. (d); *Early v. Packer*, 537 U.S. 3, 7-8 [154 L.Ed.2d 263, 86 S.Ct. 362] (2002). However, since the state court declined to provide any basis for its decision to deny the habeas corpus petition, its decision is not entitled to the deference federal courts might ordinarily accord it. *Delgado v. Lewis*, 223 F.3d 976, 982 (9 th Cir. 2000). Thus, independent review of the state court ruling for clear error is called for in the absence of a reasoned state decision:

> "[A]lthough we cannot undertake our review by analyzing the basis for the state court's decision, we can view it through the 'objectively unreasonable' lens ground by *Williams*. ... Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law. Only by that examination may we determine whether the state court's decision was objectively reasonable." *Ibid.* [internal citations omitted].

As the United States Supreme Court has explained, a state court decision "is 'contrary to' [its] clearly established law if [the decision] 'applies a rule that contradicts the governing law set forth in [its] cases' or if [the decision] 'confronts a set of facts that are materially indistinguishable from a decision of [the United States Supreme] Court and nevertheless arrives at a result different from [its] precedent.'" *Price v. Vincent*, 538 U.S. 634, 640 [155 L.Ed.2d 877, 123 S.Ct. 1848] (2003), quoting *Williams v. Taylor*, 529 U.S. 362, 405-406 [146 L.Ed.2d 389, 120 S.Ct. 1495] (2000). On the other hand, a "state-court decision that

1   correctly identifies the governing legal rule but applies it unreasonably to the facts of a

2   particular prisoner's case ... would qualify as a state decision 'involving an unreasonable

3   application of ... clearly established Federal law.'" *Id.* at 407-408.

4        In this instance, petitioner intends to show that the state appellate court's ruling was

5   "contrary to" and "unreasonably applied" clearly established federal law. In so doing,

6   petitioner would note the United States Supreme Court's observation that the phrases have

7   "overlapping meanings" and do not "define two mutually exclusive categories of questions."

8   *Id.* at 384-385. The high court has rejected as "mistaken" any "suggestion that a wrong state-

9   court 'decision' ... may no longer be redressed through habeas...." *Id.* at 385. Thus, this court

10  need not defer to the state appellate court's ruling.  *Id.* at 386-387. Rather, petitioner is

11  entitled to the "independent judgment of the federal court" as to whether federal law was

12  reasonably and correctly applied in the state proceedings. *Id.* at 387.  A state court judgment

13  cannot be upheld if, after the closest examination, "a federal court is firmly convinced that

14  a federal constitutional right has been violated." *Id.* at 389.

15  **C. "Clearly Established" Legal Principles Governing This Issue**

16       The  Sixth  Amendment  to  the  United  States  Constitution  guarantees  criminal

17  defendants the right to effective assistance of counsel. *Strickland v. Washington*,  466 U.S.

18  668, 684-685 [80 L.Ed.2d 674, 104 S.Ct. 2052] (1984) ("*Strickland* "). To demonstrate a

19  denial of the constitutional right to effective assistance of counsel, a defendant must show

20  (1) that counsel's representation was "deficient" in that it fell below standards established

21  by prevailing professional norms, i.e. "an objective standard of reasonableness" and (2) a

22  reasonable probability of a more favorable result but for the deficient representation. *Id.* at

23  687-688.

24       Rather than "articulate specific guidelines for appropriate attorney conduct," the

25  Supreme Court has instead "emphasized that 'the proper measure of attorney performance

26  [is] simply reasonableness under prevailing professional norms.'" *Wiggins v. Smith*,  539

27

1  U.S. 510, 521 [156 L.Ed.2d 471, 123 S.Ct. 2527] (2003), quoting *Strickland, supra*, 466 U.S.

2  at 688. This assessment calls for "a context-dependent consideration of the challenged

3  conduct as seen 'from counsel's perspective at the time.'" *Wiggins v. Smith, supra*, 539 U.S.

4  at 523, quoting *Strickland, supra*, 466 U.S. at 689; see also *Burger v. Kemp*, 483 U.S. 776,

5  789 [97 L.Ed.2d 638, 107 S.Ct. 3114] (1987).  The "reasonable probability" test calls for

6  reversal if the ineffective assistance raises a probability of a different result sufficient to

7  undermine confidence in the outcome reached below; however, this standard does not require

8  a showing that the deficient conduct more likely than not altered the outcome. *Strickland,*

9  *supra*, 466 U.S. at 693-694.

10        In the course of representing a client, defense lawyers "must make reasonable

11  investigations" when preparing for trial. *Raley v. Ylst*, 444 F.3d 1085, 1091 (9th Cir. 2006),

12  citing *Strickland, supra*, 466 U.S. at 691. "Pre-trial investigation and preparation are the keys

13  to effective representation of counsel." *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir.

14  1983). To render reasonably competent assistance, "counsel must, at a minimum, conduct a

15  reasonable investigation enabling him to make informed decisions about how best to

16  represent his client." *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). While "the

17  specific tasks required for adequate preparation of a defense turn on the particular facts and

18  circumstances of each case" *United States v. Tucker, supra*, 716 F.2d at 584, counsel's

19  investigation must be sufficient to allow a determination of the need to consult experts and,

20  if so, the type of experts which she needs to consult. *Caro v. Calderon*, 165 F.3d 1223, 1226

21  (9th Cir. 1998) ("*Caro*"). Expert testimony is necessary to educate the jury on issues about

22  which "lay people are unable to make a reasoned judgment alone." *Id*. at 1227.

23        **D. Federal Error: Counsel's Failure To Consult An Expert**

24        Although aware that Gonzales would testify that he managed to remove a folding

25  knife from his pocket, open it with one hand and use it to defend himself while underneath

26  a mob of men who were kicking and hitting him, trial counsel Mattison nevertheless failed

27

28  Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
    Corpus                                          13

1  either to ask him to demonstrate the operation of the knife while he was testifying or consult

2  and call to testify an expert on knives, , such as Bernard Levine (see Exh. C, par. 1),  who

3  could have both provided a demonstration and described the design features of the knife

4  which made it possible for a person to open it with one hand. By failing to prepare for trial

5  either by securing such expert testimony, or, at the very least, planning to provide for a

6  demonstration of the knife either by Gonzales himself or by some other witness experienced

7  in the knife's operation, Mattison failed to provide critical support on a factual issue which

8  was crucial to the defense's theory of self-defense. Consequently, she failed to provide

9  constitutionally adequate representation. U. S. Const., Amends. VI, XIV; *Strickland*, *supra*,

10  466 U.S. at 691.

11       Gonzales testified at trial that a group of five to six attackers, all bigger than him and

12  led by Quiroz, rushed at him from several directions, pushed him back into a bush in a dark

13  corner and pounded on him. (7 RT 978, 1048-1050.) With so many people on top of him,

14  hitting him in the head and holding him down, he became terrified and thought he could be

15  beaten to death. (7 RT 979-980, 1049-1050.)  In response, he pulled a knife from his right

16  pocket and opened it with one hand by using a knob on the blade to push it out with his

17  thumb. (7 RT 1094; see also 7 RT 979.) Panicking, he started swinging the knife and stabbed

18  someone at least "a couple times" although he "had no idea how many [times] or what ..."

19  injuries he had inflicted. (7 RT 979-980, 983.)

20       Gonzales' assertion that he had managed to open the knife  with one hand while a mob

21  of drunken men were on top of him was central to his self-defense claim. Making certain  the

22  jury understood, or at least deemed it plausible, that a person under attack could open the

23  knife in the manner he had described was particularly important to his credibility and the

24  success of his defense. Although his trial attorney knew that he would so testify (Exh. A, p.1,

25  par. 3), she never asked him to demonstrate how the knife worked or explain what features

26  made it possible to open it in that manner. (See 7 RT 968-992, 1003-1012; 8 RT 1130-1133.)

27

28

1    Instead, when he began to offer an explanation to the jury, she cut him off and shifted the

2    discussion away from the topic. (7 RT 979.)[3]

3        During cross-examination, the prosecutor pounced on Gonzales' testimonial claim.

4    The People's skillful advocate made the 20-year-old defendant's claim that he opened the

5    knife with one hand sound improbable, if not physically impossible, and therefore unworthy

6    of belief. (7 RT 1093-1097.) The importance of the exchange merits the following extensive

7    quotation from the record:

8            "Q. (By [the prosecutor] Mr. Waite) Your best evidence is 10
             people are beating you in the corner, you've been knocked down
9            flat on your back, staggered, you're holding on to someone with
             one hand, and then you tell us that then you're just lucky enough
10           to reach into your pocket and pull out that knife, right? May I
             have the exhibit? It is exhibit – –

11           ...      ...      ...  [Courtroom deputy displays the knife]

12           Q. (By Mr. Waite) That was folded in your pocket?

13           A. Yes, sir.

14           Q. It's a folding knife, right?

15           A. Yes, sir.

16

17    [3] The pertinent testimony reads:

18    "A. ... I can't tell you exactly how I got my knife out, but I got it out. It was a
19    little knob, you know, you could take it out and ....

20    Q. Were you going to reach – – it was in your pocket?

21
22    A. It was in my pocket.

23    Q. And you got your knife out?

24    A. Got it out and – –

25    Q. Were you still being hit during this whole time?

26    A. Yes." (7 RT 979-980.)

27    Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
28    Corpus                                          15

1    Q. *It takes two hands to open that knife, right?*

2    A. No, sir.

3    Q. *How did you open it with one hand?*

4    A. It has a knob on the blade right there, you could push it out with your thumb.

5    Q. It's a switchblade?

6    A. No, sir.

7    Q. You have to somehow twist that with your thumb all the way
8    open, is that how you did it?

9    A. Yes. It's not hard to do.

10    Q. Okay. So with one hand you are able to get, reach in your
11    pocket as you are being beaten up by 10 people, one hand out
      holding them off and open your knife while all this is going on;
12    is that the story?

13    MR. BEATTY [counsel for co-defendant Escamilla]: Your
      honor, objection is argumentative.

14    THE COURT: Is that your testimony?

15    Q. (By Mr. Waite) Is that your testimony?

16    A. I don"t know how long I was holding on to, but yes, the story
      is I was hanging on to somebody else at the time. I did it all with
17    one hand because I knew I couldn't reach over and did it with
      two hands. But I guess I did. I couldn't tell you exactly how.

18
      Q. *You couldn't tell us exactly how?*
19
      A. I was – – no.
20
      Q. Weren't you the one that did it?
21
      A. Yes.
22
      Q. *Why can't you tell us exactly how you managed to open this*
23    *with one hand – –*

24    A. I mean – –

25    Q. – – *while people are beating you?*

26

27

A. I know that I worked it open, the way you could open it, but I can't tell you my positioning how. I mean, I'm not understanding exactly what you're saying.

Q. It sounds like one of your Jackie Chan stories.

[Argumentative objection sustained.] ...   ...      ...

Q. Now, *so you can't explain how you got this from your pocket or open it any more than you have.*

A. I know I got it with my hand, I know I opened it with my hand, I mean, I couldn't tell you the degree, my angle, my angle my hand was at all this stuff. But yes, I did." (7 RT 1093-1095, 1097; emphasis added.)

The prosecutor continued his assault on Gonzales' explanation during closing argument, maintaining it was "impossible" for the defendant to have opened the knife "as he described it...." because "you have to take two hands to open [the knife] up." (9 RT 1509.)[4]

Contending that Gonzales "had to have opened that knife up in preparation for attacking"

---

[4] The full passage from the closing argument reads:

> "*Mr. Gonzales was asked a fair question.* How is it that you get this knife – – and you'll see, you had that instruction that this is a legal knife because it's a locking blade or folding blade knife. *How did you access this* and use it eight times? These knives are legal because they aren't dangerous switchblades where you press a button and it's instantly there and you can surprise somebody. These are legal knives, as you've all seen. They're folding blades. First you have to get it out of your pocket then *you have to take two hands to open it up.* You can't surprise somebody like he did to this victim. The *essence of that, looking at that knife,* you'll get a chance to look at it yourselves, *is that it's not – – it's impossible that he did it as he described it* was, grabbing on to someone and he's bent over a bush being beaten up and he's able *to pull that knife out of his pocket and open it with one hand and then do the stabbing. That's a lie.* The truth is he would have had to have taken that knife out and open it up in preparation. Premeditation. Planning. That's the truth and that's why he wouldn't tell you the truth or wouldn't explain that to you. *He had this lame explanation.* I think that makes it easy for you." (9 RT 1508-1509; emphasis added.)

1   Quiroz, the prosecutor reasoned the defendant had committed a premeditated murder. (9 RT

2   1515; see also 9 RT 1509.) His simple and direct logic — Gonzales was lying about how he

3   had opened the knife and therefore was lying about acting in self-defense — undoubtedly

4   hit a nerve in the defense case.

5        As previously noted, an attorney must investigate available defenses in order to

6   render reasonably competent assistance. (*Sanders v. Ratelle, supra,* 21 F.3d at 1456.) It

7   follows that a lawyer preparing for a murder trial, and knowing that her client would make

8   a claim that was crucial to the defense theory of the case, such as counsel herein knew (Exh.

9   A, p.1, par. 3.), would certainly want to consider, pursue and obtain any and all available

10  means of bolstering the believability of that claim by giving the jury whatever pertinent

11  information and assistance she could muster.

12       Here, Mattison had several ways of approaching the situation in order to prepare to

13  counter any assertion that Gonzales must be lying because he could not possibly have opened

14  the knife with one hand. First, she could have asked the court for permission to have

15  Gonzales demonstrate to the jury that it was indeed possible to open the knife with one hand.

16  Second, she could have consulted and called as a witness an expert on knives. Such a witness

17  not only could have provided such a demonstration, but he also could have explained various

18  aspects of the weapon's features and responded to the prosecutor's skepticism. (See Exh. C,

19  pp. 2-3, par. 4.) Finally, if the court either refused to allow Gonzales to demonstrate how the

20  knife opened because it feared letting a defendant facing murder charges handle a knife in

21  open court, or if it refused to authorize expert witness funding, she could have arranged for

22  another witness, such as her investigator, to provide the demonstration.

23       Not only did Mattison fail to consider or pursue any of these logical options, but she

24  did not have a tactical reason for any of her omissions. Her failure to ask Gonzales to

25  demonstrate how he could have opened the knife with one hand "was an oversight on [her]

26  part and not a trial tactic." (Exh. A, p.2, par. 4.) Also, it did not occur to her until after the

27

1  trial that she could have consulted an expert on knives, called him to testify and asked him

2  to provide such a demonstration. (Exh. A, p.2, par. 7.) She would have pursued this option

3  had she thought of it; she had no tactical reason for not doing so. (Exh. A, pp.2-3, par. 7.)

4  Similarly, she did not think of asking her investigator to obtain a knife of the same make and

5  model as the one involved in the incident and calling him to demonstrate how one could open

6  the knife with one hand. This, too, was not a tactical decision on her part, but merely an

7  oversight. (Exh. A, p.3, par. 8.)

8      Such non-tactical oversights resulted from inadequate trial preparation, planning and

9  investigation. Given the critical nature of the testimony and the reasonable probability that

10  such a demonstration could have yielded a result more favorable to Gonzales than the second

11  degree murder verdict returned below,[5] Mattison's oversights and omissions resulted in the

12  provision of constitutionally deficient representation to Gonzales.

13      Moreover, even if, *arguendo*, one were inclined not to credit Mattison's averments

14  and conclude she acted for some unspecified strategic reason, judicial scrutiny of her

15  omissions would remain warranted. *United States v. Tucker, supra*, 716 F.2d at 586. "Certain

16  defense strategies may be so ill-chosen that they may render counsel's overall representation

17  constitutionally defective. ... 'Defense strategy and tactics which lawyers of ordinary training

18  and skill in the criminal law would not consider competent deny a criminal defendant the

19  effective assistance of counsel, if some other action would have better protected a defendant

20  and was reasonably foreseeable before trial.'" *Ibid.*, quoting *Beasley v. United States*, 491

21  F.2d 687, 696 (6th Cir 1974).

22

23

24  _____

25  [5] Because of the similar consequences flowing from all three aspects of the asserted deficient
   representation, petitioner shall discuss the prejudicial effect of counsel's omissions in a separate

26  section of this memorandum, section IV. This consolidated prejudice argument is intended to
   apply to each of the contentions advanced herein.

27

28  Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
   Corpus                                    19

1    Analogous case law demonstrates that the failure to consult with and call a necessary

2    expert witness or otherwise reasonably investigate and prepare for the presentation of a

3    critical defense at trial constitutes professional incompetence.

4    In *Caro, supra*, 165 F.3d 1223, a defense attorney preparing for the penalty phase of

5    a capital case failed to consult experts on the effects of chemical poisoning even though he

6    knew the defendant had suffered from "extraordinary acute and chronic exposure to

7    neurotoxicants ...." ( *Id.* at 1226, 1228.) Mere consultation with medical doctors was

8    inadequate since counsel had "an obligation to conduct an investigation which [would] allow

9    a determination of what sort of experts to consult[,]" and he "failed to provide those who did

10   examine Caro with the information that he had." (*Ibid.*) As this court observed: "All counsel

11   had to do was ask the question 'What did all that extraordinary exposure to chemicals do to

12   his brain?' And then, in order to find the answer, he merely had to address the question to

13   either a neurologist or toxicologist. Similarly, he could have asked the question to the experts

14   he did retain who would have then told him that he needed to consult others." (*Id.* at 1228.)

15   While an explanation of the thumb-stud mechanism which facilitates the one-handed

16   opening of a folding knife may not require the same degree of scientific expertise  as one

17   might need to present a death penalty mitigation case based on extreme aggressiveness

18   resulting from neurotoxicant poisoning, it nevertheless called for of a level of knowledge or

19   experience with knives beyond the probable understanding or exposure of the average lay

20   juror, many of whom very likely had limited exposure, or none whatsoever, to the intricacies

21   of folding buck knives. (See *id.* at 1227 ["Expert evidence is necessary on ... issues when lay

22   people are unable to make a reasoned judgment alone."].)

23   A familiarity, or the lack of it, with folding buck knives and similar implements, tends,

24   at least to some extent, to be a product of the kind of upbringing, recreational pursuits, socio-

25   economic status or life experiences a person may or may not have had. In that sense, the

26   jurors' likely understanding of, or exposure to, folding buck knives represents a kind of

27

28   Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
     Corpus                                        20

1   "cultural gap," and this court has squarely recognized that an attorney's "failure to present

2   evidence necessary to bridge a cultural gap may constitute ineffective assistance of counsel."

3   *Id.* at 1226, citing *Siripongs v. Calderon*, 35 F.3d 1308, 1316 (9ᵗʰ Cir. 1994).

4           For example, after examining the packaged knife in the exhibit room, the same exhibit

5   which jurors would have viewed during deliberations, attorney Firstman realized that her

6   "lack of experience with similar knives" left her "in no position to determine whether this

7   was a one-hand opening knife absent the assistance of either an expert or someone familiar

8   with this type of knife." (Exh. B, p. 2, par. 9.) Knife expert Levine estimates that many, and

9   "possibly a majority" of laypersons who encounter thumb studs on knives for the first time

10  "do not figure out the[] mechanism[] on their own" because they either "do not realize that

11  the stud has a function, or do not even notice that it is present." (Exh. C, p. 3, par. 5.) Thus,

12  Firstman simply "did not recognize the presence or purpose of the thumb stud" when she

13  looked at the knife within the packaging. (Exh. B, p. 2, par. 9.) In Levine's experience,

14  persons who are unable to "recognize the presence or purpose of the thumb stud, or who do

15  not work out on their own how to operate it, typically turn for help to a ... person already

16  familiar with this type of knife." (Exh. C, p. 3, par. 6.)

17          Because of the knowledge or "cultural gap" which likely exists with respect to the

18  one-handed operation of a folding knife, the jurors in this case needed either to hear from a

19  knife expert or, at the very least, see a demonstration of the knife's one-handed operation in

20  order to assess Gonzales' credibility and thereby determine the merits of his self-defense

21  claim. As in *Caro*, when preparing this case all Mattison "had to do was ask" herself what

22  the jury would think of Gonzales' claim that he opened the knife with one hand while under

23  a pile of attackers? Would jurors believe such a maneuver was possible based solely on his

24  testimony, without any supporting information? Would not lay jurors, particularly those

25  unfamiliar with folding knives, find his testimony far more convincing if they could see a

26  demonstration or hear from an expert who could explain how the knife worked?

27

Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas

28  Corpus                                                      21

1    Had counsel made such a minimal inquiry about the crux of her case while preparing

2    for trial, Gonzales would have had a much greater chance of having the jury accept his

3    testimony and either acquit him or, at the very least, only find him guilty of voluntary

4    manslaughter based on an imperfect self-defense theory. However, since she apparently

5    failed to ask such questions or otherwise perceive that consultation with an expert or

6    arranging for a demonstration was critical to the defense case, she provided Gonzales with

7    ineffective assistance.

8    Counsel's failure to seek out the aid of an expert witness when preparing for trial also

9    reflects her fundamental lack of understanding of the extent to which independent

10   corroboration of her client's claim regarding the knife would have strengthened his case.

11   In *United States v. Tucker, supra,* 716 F.2d 576, counsel similarly failed to discern the

12   need to corroborate her client's testimony in order to present an adequate defense. There, the

13   named defendant, who faced charges of income tax fraud and conspiring to defraud the

14   government, needed to convince the jury that he was an outsider to the corporate hierarchy

15   of a particular engineering firm and lacked knowledge of the fraud being perpetrated by

16   others. *Id.* at 580. Since, in this Court's opinion, it was "readily apparent" that this was his

17   "only plausible theory of defense," Tucker's counsel "should have discerned ... that the

18   [verdict] would depend in large part on the testimony and credibility of the government's

19   witnesses[]" and that it was therefore "... crucial for Tucker both to undermine the[ir]

20   credibility ... and to establish the plausibility of his own testimony." *Ibid.*

21   Nevertheless, counsel failed to interview any of the persons whom his client had

22   identified as "witnesses who could either corroborate his testimony, or at least counter or

23   minimize the inculpatory inferences which could be drawn from the circumstantial evidence

24   presented by the government." *Id.* at 581. Counsel also failed either to obtain assistance in

25   managing the voluminous amount of pre-trial discovery involved in the case or to consult

26   appropriate experts regarding the highly technical and complex federal statute which Tucker

27

28   Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
Corpus                                        22

1  was accused of violating. *Ibid.* In this Court's view, "it should have been obvious to a

2  competent lawyer that the assistance of an accountant would be necessary to trace the

3  distribution of the funds alleged to have been illegally spent." *Ibid.*

4  　　　Counsel's "failure to identify or interview" potential corroborative witnesses

5  prevented him from developing a corroboration for Tucker's defense and therefore "made

6  it impossible for the jury to make an independent judgment as to whether there was a

7  reasonable doubt regarding Tucker's guilt." *Id.* at 583. As in the instant case, where the

8  prosecutor targeted the lack of corroboration of Gonzales' claim regarding the knife by

9  ridiculing the assertion and branding the defendant a liar, so, too, in *Tucker* was the "absence

10 of any corroboration for Tucker's testimony ... repeatedly underscored and exploited by the

11 prosecutor in his closing argument." *Ibid.* In both cases, such argument "eloquently

12 emphasized the importance of corroboration" to the defense. *Id.* at 584. Just as the failure of

13 Tucker's attorney "to interview any of the witnesses who would have corroborated his

14 defense clearly demonstrate[d] a total absence of diligent and conscientious advocacy," *ibid.,*

15 so, too, is the absence of competent representation shown by Mattison's failure to recognize

16 the need for corroboration and provide for it either by consulting an expert or in some

17 similarly effective manner, such as by providing a demonstration.

18 　　　For all of the foregoing reasons, the state appellate court unreasonably applied and

19 reached a decision contrary to clearly established federal law by failing to recognize that the

20 representation counsel provided was constitutionally inadequate. Accordingly, this court

21 should grant the instant petition for writ of habeas corpus.

22

23

24

25

26

27

28 Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
    Corpus                                                         23

## II.

**THE CALIFORNIA COURT OF APPEAL UNREASONABLY APPLIED CLEARLY ESTABLISHED FEDERAL LAW WHEN IT REJECTED PETITIONER'S CONTENTION THAT TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO OBJECT TO THE COURT'S DECISION TO PLACE THE KNIFE IN SEALED, PRESSURIZED PACKAGING BEFORE ALLOWING IT INTO THE JURY ROOM AS AN EXHIBIT**

**A. Procedural Background**

During the noon recess on July 26, 2005, the 12th day of the trial, Mattison approached the court informally and off the record regarding the knife. (Exh. A, p.2, par. 5.) She asked that the knife be physically submitted to the jury so the jurors "could manually operate it to verify or not [Gonzales'] testimony that the knife was easily opened with one hand because it had a 'roll-up' knob." (Exh. A, p.2, par. 5.)[6]

Upon taking the bench following the recess, the court made the following statement:

> "Ladies and gentlemen of the jury, what's occurred over the recess here, I have taken a look at this exhibit, the Exhibit 16, this is the knife. And what the situation is, we've taken several photographs of this knife and they haven't really come out very well for you to see. However, it's been represented to me that this package it's in is a heat pressurized package, and there's a special reason for that. Any time there's ... a weapon of any kind, it is to prevent the weapon from being contaminated from any source outside, and it also keeps anything in the package on the inside where it won't leak out. So this is pressure and heat-sealed. It's not like a sandwich baggy, it's a much tighter situation than that.
>
> [Par.] So what I'm going to do is I'm going to allow it into — it's already in evidence, but I'm going to allow it to go into the jury room so you may personally look at it very carefully. However, when you're done looking at it, if you would tell the deputy that you're done, you don't need it any more, he will then gather it up and store it away, And if you need it again after that

---

[6] Mattison recalls this conversation occurring informally and off the record. The prosecutor had no recollection of any such discussion or of any position, if any, he took with respect to the defense request. Mattison also could not recall if the prosecutor made any comment during the discussion. (ACT 2.) (See fn.2 at p. 6, *ante*.)

Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus                    24

just tell the deputy and he again will retrieve it for you if you deem necessary.

[Par.] For the record this exhibit 16 is being delivered back to the clerk. Please maintain possession of it. And we are ready for our next witness." (8 RT 1209-1210.)

The trial proceeded. The record contains no indication that Mattison ever objected to the court's decision to submit the knife into the jury room in pressurized packaging. According to her declaration, she interpreted the court's pronouncement as a summary denial of her request. (Exh. A, p.2, par. 6.) She had no tactical reason for refraining from objecting to the ruling or failing to seek reconsideration of it on the record; however, she believed that doing so would be futile since the court had already decided the issue. (Exh. A, p.2, par. 6.)

**B. Federal Error**

Notwithstanding her belief in the futility of any further objection, Mattison's reticence amounted to deficient representation because the consequences of the court's decision were detrimental to the defense, inasmuch as the combination of such pressurized packaging and the court's comments very likely prevented the jury not only from testing the knife itself but even from asking to have it removed from the packaging so it could test it.

The rules governing the use of exhibits by juries are clearly defined under California law. As further shown herein, such rules would have supported a defense objection to the court's decision and militated in favor of allowing the jury reasonable access to the knife outside of the pressurized packaging. Since an appropriate objection would have been meritorious and would have permitted the jury to test the knife, the state appellate court's implicit determination that counsel was not ineffective by failing to object was both contrary to and unreasonably applied federal law requiring effective and competent representation.

The California Supreme Court has stated "the true rule guiding the court and governing the jury in the use of exhibits" under California law as follows:

"The court may permit the jury to take with them and use in their deliberations any exhibit where the circumstances call for

it, observing the proper precaution of instructing the jury in the nature of the use which they shall make of the exhibit. It is a fundamental rule that all evidence shall be taken in open court and that each party to a controversy shall have knowledge of, and thus be enabled to meet and answer, any evidence brought against him. It is this fundamental rule which is to govern the use of such exhibits by the jury. **They may use the exhibit according to its nature to aid them in weighing the evidence which has been given and in reaching a conclusion upon a controverted matter. They may carry out experiments within the lines of offered evidence**, but if their experiments shall invade new fields and they shall be influenced in their verdict by discoveries from such experiments which will not fall fairly within the scope and purview of the evidence, then, manifestly, the jury has been itself taking evidence without the knowledge of either party, evidence which it is not possible for the party injured to meet, answer, or explain." *Higgins v. Los Angeles Gas &Electric Co.* (1911) 159 Cal. 651, 656-657; emphasis added.)

As *Higgins* indicates, submission of the knife to the jury in a manner which would have enabled the jurors to "use the exhibit according to its nature to aid them in weighing the evidence ... [and] carry out experiments within the lines of offered evidence" would have been permissible under the law. (*Id.* at 657; see also *People v. Barrett* (1913) 22 Cal.App. 780, 785 [recognizing trial court's discretionary power to allow certain exhibits, including a revolver, into the jury room]; *People v. Baldine* (2001) 94 Cal.App.4th 773, 779.) Since Gonzales described in his testimony how he had managed to open the knife with one hand by using the roll-up knob on the knife (7 RT 1094), it would have been permissible for the jury to examine the knife and verify that it could have been opened in such a manner since such an experiment would have been "within the lines of the offered evidence."

In *People v. Bogle* (1995) 41 Cal.App.4th 770, a defendant's access to a certain safe and its contents was at issue in a murder trial. Investigators had found a safe in his bedroom closet and a set of keys, which the defendant claimed as his own, in the entryway of his house. The safe contained jewelry belonging to the murder victims, a married couple. Testifying at his trial, the defendant claimed that the husband had asked him to buy cocaine with the contents of the safe and that he had refused but nevertheless retained the safe. He

1   also identified the lock each key would open but did not say any of the keys opened the safe.

2   Both the safe and the keys were sent into the jury room as exhibits. During deliberations, the

3   jury submitted a note which revealed that it had tried to open the safe using the keys and

4   asking if it could consider such evidence. (*Id.* at 777.)

5       The defendant moved for a mistrial, claiming the jury had violated the court's explicit

6   instruction not to conduct experiments. (*Id.* at 778.) The trial court disagreed and permitted

7   the jury to consider the evidence, comparing the situation "to one in which a jury is given a

8   picture and sees something in the picture that adds insight into the case ...." (*Ibid.*)

9       On appeal, the defendant claimed that "the jury's discovery of the relationship

10  between the key and the safe violated his right to trial by jury and his right to be present when

11  evidence is presented." (*Ibid.*) Rejecting the claim, the appellate court noted: "Not every

12  experiment constitutes jury misconduct. Jurors must be given enough latitude in their

13  deliberations to permit them to use common experiences and illustrations in reaching their

14  verdicts." (*Ibid.*, quoting *People v. Cumpian* (1991) 1 Cal.App.4th 307, 316, in turn quoting

15  *United States v. Avery* (6th Cir. 1983) 717 F.2d 1020, 1026; internal quotation marks and

16  brackets omitted.) It further observed that "[p]alpation of the safe and keys was 'within the

17  lines of offered evidence[]'" since both items were "properly introduced into evidence and,

18  thus, were properly given to the jury for examination." ( *People v. Bogle, supra,* 41

19  Cal.App.4th at 779.)

20      Similarly, in this case, the knife was properly introduced into evidence and admitted

21  as an exhibit. (See 3 RT 243 [People's Exhibit 16 marked for identification]; 5 RT 683

22  [People's Exhibit 16 admitted into evidence].) If the knife had not been placed in pressurized

23  packaging, the jury could have palpated it by experimenting with the roll-up knob in order

24  to test Gonzales' claim. Such experimentation would have been "within the lines of offered

25  evidence" and would not have invaded new fields as that term is used in *Higgins.*

26

27

1    As the *Bogle* court explained: "... the term 'field,' as used in *Higgins*, does not mean
2    one specific fact. A 'field,' instead, is an area of inquiry, such as the extent of the defendant's
3    access to the contents of the safe or whether the defendant was a credible witness." (*People
4    v. Bogle, supra*, 41 Cal.App.4th at 779.) In the instant case, both Gonzales' credibility and
5    his specific claim regarding how he managed to open the knife with one hand constituted a
6    field of inquiry which was well within the lines of the offered evidence.

7    As with the need for expert testimony or demonstration discussed in the preceding
8    section, allowing for the possibility of testing of the knife by the jury was critical to the
9    defense because it would have provided the panel with a means of confirming Gonzales'
10    testimony and deeming his account of events more credible than that of the prosecution's
11    witnesses. By submitting the knife to the jury in pressurized packaging, the court necessarily
12    discouraged such testing of the exhibit. The packaging would have prevented the jurors from
13    handling the knife and trying to open it in the manner Gonzales had described. (See Exh. B,
14    p. 2, par. 7. ["Though I attempted to manipulate the knife within the packaging, the blade
15    appeared to be locked in the open position, and the knife itself could not be easily moved
16    within the packaging."]; see also Exh. C, p.4, par. 8 ["The plastic bag, being slippery, might
17    impede closing and re-opening the blade, particularly one-hand opening of the blade by use
18    of the thumb stud. ... For a person unfamiliar with the locking liner and thumb stud
19    mechanisms, having to handle the knife inside the bag would likely compound their
20    difficulties."]. ) "To prohibit jurors from analyzing exhibits in light of proffered testimony
21    would obviate any reason for sending physical evidence into the jury room in the first
22    instance." (*People v. Cumpian, supra*, 1 Cal.App.4th at 316.) The same can equally be said
23    about packaging which precludes meaningful testing of an object which is the subject of
24    critical inquiry in a case.

25    In light of the importance of having the knife available to the jury for testing, effective
26    counsel would have strenuously objected to the manner in which the exhibit was being

27

28    Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
     Corpus                                           28

1    submitted and would have sought reconsideration of the ruling despite any sense of apparent

2    futility in doing so. Had she done so, she would have enabled the court to better understand

3    the defense's perception of the importance of having the knife accessible to the jury for

4    testing, a matter which simply might not have occurred to the court on its own.

5        In pressing her objection, Mattison also could and should have argued that the court's

6    principal reason for using the pressurized packaging, avoiding possible contamination of the

7    exhibit, was a secondary concern which was far outweighed by the need for accessibility to

8    the exhibit. This was so for several reasons which effective counsel would have pointed out

9    to the court.

10       First, police had already tested the knife and determined that Quiroz' blood was on

11   it. (5 RT 684.) Secondly, Gonzales had acknowledged that the knife was his and that he had

12   used it in self-defense in the manner described in his testimony. Both of these considerations

13   would likely render future appellate claims respecting the blood evidence on the knife both

14   unlikely and untenable. Finally, and most importantly, counsel should have emphasized that

15   the critical issue in this case, both at trial and for any foreseeable appeal, would be whether

16   Gonzales had used the knife in the manner he claimed and had stabbed Quiroz because he

17   believed he was in imminent danger of death or great bodily injury, not whether the knife

18   was in fact the weapon used to kill Quiroz or whether some person other than Gonzales was

19   the killer. In other words, since the issues in this case were clearly ones of mental state and

20   witness credibility, not identity or weapon use, potential contamination of the knife was

21   plainly of secondary concern compared to the need to have the knife available for testing by

22   the jury to confirm or refute Gonzales' testimony.

23       Based on the foregoing considerations, it would seem reasonably probable that the

24   court would have reconsidered its decision and submitted the knife to the jury outside of the

25   packaging if counsel had properly objected. Since the defense position on the issue was

26   meritorious, counsel's failure to object constituted  ineffective representation. (See *People*

27

28   Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
     Corpus                                    29

1  *v. Mattson* (1990) 50 Cal.3d 826, 876.)  The appellate court unreasonably applied clearly

2  established federal law when it failed to recognize that petitioner received deficient

3  representation under applicable state law and summarily denied his petition for writ of habeas

4  corpus.  Accordingly, this court should grant the instant petition.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.

**THE CALIFORNIA COURT OF APPEAL UNREASONABLY APPLIED CLEARLY ESTABLISHED FEDERAL LAW WHEN IT REJECTED PETITIONER'S CONTENTION THAT TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT TO THE PROSECUTORIAL MISCONDUCT WHICH OCCURRED WHEN THE PROSECUTOR ARGUED FACTS OUTSIDE THE EVIDENCE, TO WIT, THAT IT WAS IMPOSSIBLE TO OPEN WITH ONE HAND THE FOLDING KNIFE INVOLVED IN THE HOMICIDE**

Trial counsel also provided ineffective assistance of counsel by failing to object when the prosecutor committed misconduct by arguing facts outside of the evidence during his closing argument.

In his summation to the jury, the prosecutor maintained that it was "impossible" for Gonzales to have opened the knife "as he described it...." because "you have to take two hands to open [the knife] up." (9 RT 1509.) The full passage from the argument reads:

> "Mr. Gonzales was asked a fair question. How is it that you get this knife – – and you'll see, you had that instruction that this is a legal knife because it's a locking blade or folding blade knife. How did you access this and use it eight times? These knives are legal because they aren't dangerous switchblades where you press a button and it's instantly there and you can surprise somebody. These are legal knives, as you've all seen. They're folding blades. First you have to get it out of your pocket then *you have to take two hands to open it up.* You can't surprise somebody like he did to this victim. The *essence of that, looking at that knife,* you'll get a chance to look at it yourselves, *is that it's not – – it's impossible that he did it as he described it* was, grabbing on to someone and he's bent over a bush being beaten up and he's able *to pull that knife out of his pocket and open it with one hand and then do the stabbing. That's a lie. The truth is he would have had to have taken that knife out and open it up in preparation.* Premeditation. Planning. That's the truth and that's why he wouldn't tell you the truth or wouldn't explain that to you. *He had this lame explanation. I think that makes it easy for you.*" (9 RT 1508-1509; emphasis added.)

As best petitioner can determine after a thorough review of the record, no witness ever testified at trial that the folding knife could not be opened with one hand, much less that it was "impossible" to do so. Quite simply, there was no evidence in the record to support the

Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus                              31

1   prosecutor's purportedly factual assertions regarding the knife. Nevertheless, petitioner's

2   counsel failed to object to such bold argument based on matters which were clearly outside

3   of the record.[12]

4        Counsel's omission constituted ineffective representation. Because nothing in the

5   evidence established that it was "impossible" to open the knife with one hand, an objection

6   that the prosecutor was arguing facts not in evidence would have been meritorious. See

7   *United States v. Azubike*, 504 F.3d 30, 38 (1st Cir. 2007) [factually inaccurate recitation of

8   evidence constitutes misconduct]. Consequently, the court should have granted a timely

9   objection, motion to strike and request for admonition, and counsel's failure to assert a

10  meritorious objection fell below the standard of professional competence. *People v. Mattson,*

11  *supra,* 50 Cal.3d at 876.

12       As her supplemental declaration indicates, petitioner's trial counsel heard the

13  prosecutor's argument and realized at the time that he was asserting factual information

14  without evidentiary support in the record. (See Exhibit D, Supplemental Declaration of

15  Christine Mattson, pp. 1-2, pars. 3-4; hereafter cited as "Exh. D.") However, she decided not

16  to object, opting instead to address the misleading contention in her own argument. (Exh. D,

17  p. 2, pars. 4-5.) She now describes such failure as "inexcusable" and avers that she did not

18  have a tactical reason for refraining from objecting. (Exh. D, p. 2, par. 5.) Accordingly, the

19  lack of objection below was not the result of a rational, tactical decision by counsel.

20       To the extent respondent may nevertheless characterize counsel's decision to respond

21  to the argument without objecting to it as a tactical choice, such a trial tactic was simply not

22  reasonable under the circumstances and cannot justify the omission. Counsel's decision not

23

24  [12] Indeed, as petitioner has demonstrated through Mr. Levine's declaration, the blade of the
    knife is fitted with a "thumb stud" which makes it "possible" to open the knife using only one's
25  right hand. (Exh. C., p.2, par. 4.) While the jury never heard such evidence because of the other
    instances of ineffective representation detailed herein, the declaration nonetheless demonstrates
26  that the prosecutor's argument was factually incorrect as well as lacking support in the record.

27
    Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
28  Corpus                                              32

1    to interpose a timely objection deprived her client of the opportunity to have the jury

2    instructed to disregard the argument, a powerful remedy because it would have "immediately

3    signalled that the prosecutor's remarks were improper." *People v. Montiel*, 5 Cal.4th 877,

4    915 (1994). Moreover, since "a defendant cannot complain on appeal of the prosecutor's

5    misconduct at trial unless he timely objected and requested that the jury be admonished to

6    disregard the impropriety" *People v. Herring*, 20 Cal.App.4th 1066, 1074 (1993), the tactic

7    of foregoing an objection to improper argument on such a critical aspect of the case

8    precluded appellant from seeking direct appellate review of the issue in the unlikely event

9    that the court would have erroneously overruled her objection.

10       In light of the potential advantages at trial to making a timely objection and the

11   handicap of forfeiting a significant appellate issue by failing to object, counsel's decision,

12   even if deemed a tactical one despite her declaration to the contrary, was not a reasonable

13   trial tactic. She risked nothing by objecting since even an erroneous ruling from the trial

14   court would not have prevented her from making the same counter-argument which she

15   eventually raised.

16       In some situations, courts have excused an attorney's failure to object to repeated

17   instances of prosecutorial misconduct during closing argument or have viewed such an

18   omission as tactically reasonable because an attorney might fear appearing obstructionist and

19   alienating the jury by raising an excessive number of objections, see, e.g. *People v. Hill* 17

20   Cal.4th 800, 820-821 (1998); however, counsel could not reasonably have perceived such a

21   risk in this situation. The record shows that she did not raise a single objection during the

22   entirety of the prosecutor's closing argument. (See 9 RT 1506-1532.) Therefore, objecting

23   to an aspect of that argument which lacked factual support in the record but went to the heart

24   of the defense case could hardly have aroused any fair juror's ire.

25       Moreover, while counsel sacrificed a great deal by foregoing the objection, she hardly

26   made up any lost ground with the counter-argument she elected to put forward. Instead of

27

28   Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
     Corpus                                    33

1    making it very clear that nothing in the evidence supported the prosecutor's assertion that

2    two hands were needed to open the knife and that one could not therefore conclude Gonzales

3    was lying by claiming to have opened it with one hand, she instead focused on the

4    prosecutor's somewhat peripheral claim that Gonzales had brought a deadly weapon to the

5    party. She argued that it was legal to carry such a "folding knife" because it was not a

6    switchblade or what the law referred to as a "dirk or dagger." (10 RT 1551-1552.) Only in

7    that context, and then only briefly, did she argue that the knife could be opened with one

8    hand by using "a little lever that you can push up." (10 RT 1552.) However, in the absence

9    of expert testimony or some other demonstration of how the "lever", i.e., the thumb-stud,

10    worked, this assertion was unlikely to carry much weight with the jury since it, like the

11    prosecutor's contrary contention, was similarly based on a fact outside the evidence.

12        Then, apparently to reiterate her point that folding or pocket knives are not inherently

13    deadly weapons but only become so if used as such, she digressed into a reminiscence about

14    her father and other men in her home state of Minnesota carrying pocket knives. (10 RT

15    1552.) Such an unfocused argument hardly overcame the central thrust of the prosecutor's

16    contention that Gonzales was a liar because of the impossibility that the knife could be

17    opened with one hand.

18        For all of the foregoing reasons, trial counsel's decision not to object and instead to

19    address the prosecutor's improper argument in her own closing was not a tactical decision

20    on her part, or, even if characterized as such, was not a rational and reasonable tactic which

21    would excuse her ineffectiveness.

22        Moreover, as noted above, an objection would have been meritorious since the

23    prosecutor's argument of facts outside the record plainly constituted misconduct. "It is error

24    for counsel to make statements in closing argument unsupported by the evidence, to misstate

25    admitted evidence, or to misquote a witness' testimony. ... ... ... [Par.] A misstatement of

26    evidence is error when it amounts to a statement of fact to the jury not supported by proper

27

28

Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
Corpus                                        34

evidence introduced during trial, regardless of whether counsel's remarks were deliberate or made in good faith." (*United States v. Watson*, 171 F.3d 695, 699-700 (D.C. Cir. 1999); see also 3 Wright et al. Federal Practice & Procedure sec. 555 (3d ed. 2007) ["It is misconduct for a prosecutor to make an assertion to the jury of a fact, either by way of argument or by an assumption in a question, unless there is evidence of that fact."].

A prosecutor's closing argument is an especially critical period of trial. *People v. Alverson*, 60 Cal.2d 803, 805 (1964). Since such argument comes from an official representative of the People, [13] it carries great weight and must therefore be reasonably objective. *People v. Talle*, 111 Cal.App.2d 650, 677 (1952). A prosecutor commits misconduct when he argues facts that are not "based on the evidence" and which are therefore outside of the record. *People v. Bell*, 49 Cal.3d 502, 539 (1989). Such departure from the evidentiary record developed at trial constitutes a reprehensible means of persuasion because it deceives the jury and undermines the very foundation of the adversarial process.

The United States Supreme Court has clearly established that a prosecutor's conduct violates the Fourteenth Amendment when it infects a trial with such unfairness as to make a conviction a denial of due process.  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 [40 L.Ed.2d 431, 94 S.Ct. 1868] (1974).  Even if the  conduct does not rise to that level, it nonetheless constitutes misconduct under California law if it "involves the use of deceptive or reprehensible methods to attempt to persuade ... the jury." *People v. Morales*, 25 Cal.4th 34, 44 (2001); see also *People v. Price*, 1 Cal.4th 324, 447 (1991).

---

[13] Because the prosecutor represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done" *Berger v. United States*, 295 U.S. 78, 88 [79 L.Ed. 1314, 55 S.Ct. 629] (1935), he or she is held to a standard higher than that imposed on other attorneys. See *People v. Kelly*, 75 Cal.App.3d 672, 690 (1977).

1    Here, the prosecutor's improper argument with respect to the case's most critical piece

2    of evidence resulted in such fundamental unfairness as to deny Gonzales his federal

3    constitutional right to due process and a fair trial. U.S. Const., Amends. V, VI and XIV.

4    *Arguendo*, even if the argument did not render the trial fundamentally unfair, it nevertheless

5    constituted misconduct under state law because it involved "'the use of deceptive or

6    reprehensible methods to attempt to persuade either the court or the jury." *People v. Haskett*,

7    30 Cal.3d 841, 866 (1982), quoting *People v. Strickland*, 11 Cal.3d 946, 955 (1974). Defense

8    counsel's failure to object to argument that amounted to prosecutorial misconduct and was

9    improper under federal and state law resulted in the provision of constitutionally ineffective

10   representation under clearly established federal law. *Strickland, supra*, 466 U.S. at 691.

11   Because nothing in the record supported the prosecutor's argument, his assertion

12   would have led the jury to believe that he was aware of information outside the record

13   regarding the need to use two hands to open the knife. Federal courts have recognized that

14   "[i]mproper prosecutorial comments may lead the jury to infer that the prosecutor knows

15   undisclosed facts which she could not present to the jury." *United States v. Mastrangelo*, 172

16   F.3d 288, 297 (3rd Cir. 1999) ("*Mastrangelo*"); see also *People v. Wiley*, 57 Cal.App.3d 149,

17   163 (1976). In light of this danger, "[a]ttorneys are forbidden from saying anything to the

18   jury to imply that evidence supporting their position exists but has not been introduced at

19   trial." *Brooks v. Francis*, 716 F.2d 780, 788 (11th Cir. 1983) vac. by *Kemp v. Brooks*, 478

20   U.S. 1016 (1986).

21   In *Mastrangelo*, the named defendant was on trial for conspiring to manufacture

22   methamphetamine, and the prosecution "sought to have the jury infer that Mastrangelo was

23   the 'cook,' that is, the individual who actually turned the ingredients into methamphetamine,

24   [even though] it had no evidence, direct or indirect, of that fact."     *United States v.*

25   *Mastrangelo, supra*, 172 F.3d at 297. The parties entered into a limited stipulation that

26   Mastrangelo possessed both the equipment and "' ... the chemical background to know the

27

28   Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
     Corpus                                    36

1    ingredients ..." needed to make the drug,  but they "did not stipulate that he knew how to

2    make methamphetamine." *Id.* at 295. The trial court rebuffed a prosecution request to add

3    language to the stipulation stating that Mastrangelo knew the manufacturing process. *Ibid.*

4    During closing argument, the prosecutor cited the stipulation, maintained there was no

5    evidence that anyone else involved in the conspiracy had such manufacturing knowledge,

6    and, shortly thereafter,  "directly mischaracterized" the stipulation by claiming it was clear,

7    based thereon, that Mastrangelo knew how to make the drug. *Id.* at 296.

8         Finding such statements improper, the Third Circuit observed that  they distorted the

9    substance of the evidence by "inflating the limited stipulation ... to encompass a meaning that

10   the District Court had previously ruled unwarranted, i.e. that because of his knowledge of the

11   ingredients and equipment needed, Mastrangelo knew how to make methamphetamine."

12   *Ibid.* Moreover, the comment concerning the absence of evidence that any of the alleged co-

13   conspirators had such knowledge "impermissibly shifted the burden of proof to Mastrangelo

14   to demonstrate that one of the other conspirators knew how to make methamphetamine."

15   *Ibid.*

16        In *People v. Herring, supra,* 20 Cal.App.4th 1066, the prosecutor argued that the State

17   represented "victims" while defense counsel's "people are rapists, murderers, ..., child

18   molesters" and other criminals whom he had to "tell ... what to say" and "help ... plan a

19   defense" since he did not want the jury to hear the truth. *Id.* at 1075. Such argument "implied

20   that the prosecutor knew facts not in evidence [] ... [and] amounted to unsworn testimony"

21   which violated the defendant's Sixth Amendment right to confrontation and to effective

22   counsel. *Id.* at 1076-1077. Consequently, "the misconduct involved federal constitutional

23   error." *Id.* at 1077. Moreover, the People could not meet their burden of proving beyond a

24   reasonable doubt that the error did not contribute to the jury's verdict, see *People v. Bolton*

25   (1979) 23 Cal.3d 208, 214 and *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d

26   705, 87 S.Ct. 824], or even the lesser standard of prejudice for error arising solely under state

27

28   Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
     Corpus                                        37

1  law, see *People v. Watson* (1956) 46 Cal.2d 818, 836, because the critical issue in the case

2  was one of credibility and "the prosecutor's remarks went to the heart of the defense" and

3  "accused defense counsel of fabricating a defense ...." *People v. Herring, supra*, 20

4  Cal.App.4th at 1077.

5          In the instant case, the question of whether Gonzales was able to open the knife with

6  one hand as he claimed similarly "went to the heart of the defense." While the argument did

7  not directly accuse trial counsel of encouraging her client to lie to the jury, it impliedly did

8  so by maintaining that Gonzales' testimony about opening the knife with one hand was "a

9  lie." (9 RT 1508-1509.) Where "there is a reasonable likelihood that the jury would

10  understand the prosecutor's statements as an assertion that defense counsel sought to deceive

11  the jury, misconduct would be established." *People v. Cummings* , 4 Cal.4th 1233 , 1302

12  (1993); *People v. Clair*, 2 Cal.4th 629, 663 (1992). Similarly, in the absence of evidence in

13  the record to support a claim that defense counsel fabricated a defense, such an "unsupported

14  implication" to that effect constitutes misconduct. *People v. Bain*, 5 Cal.3d 839, 847 (1971);

15  see also *People v. Hawthorne*, 4 Cal.4th 43, 59-60, fn. 8 (1992) [finding objectionable

16  prosecutor's comments that state is obligated to present the truth while defense counsel is

17  expected and permitted by law to disregard the truth in defense of his client].

18          Regardless of whether the prosecutor's misconduct violated the federal constitution

19  or merely offended state law, the state appellate court's implicit finding that counsel's failure

20  to object to such misconduct did not deprive Gonzales of his federal right to effective

21  representation amounted to a misapplication, and was contrary to, clearly established federal

22  law for all of the reasons set forth above. Accordingly, this court should grant the habeas writ

23  sought herein.

24

25

26

27

28

## IV.

## COUNSEL'S INEFFECTIVENESS PREJUDICED PETITIONER

In order to obtain collateral relief from a state conviction, a federal habeas petitioner must show that the constitutional error which occurred in his case "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 [123 L.Ed.2d 353, 113 S.Ct. 1710] (1993); *Kotteakos v. United States*, 328 U.S. 750, 776 [90 L.Ed.1557, 66 S.Ct. 1239] (1946). In applying that standard, this court must conduct a de novo review of the record and attempt to discern the error's effect on the jury's decision. *Arnold v. Runnels*, 421 F.3d. 859, 867-868 (9th Cir. 2005). "The question posed ...is not whether the evidence was sufficient or whether the jury would have decided the same way even in the absence of the error. The question is whether the error influenced the jury." *Id.* at 868; see *Kotteakos v. United States*, *supra*, 328 U.S. at 763-765; *Brecht v. Abrahamson*, *supra*, 507 U.S. at 642-643 (Stevens, J., concurring). If the court "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Ibid.*, quoting *Kotteakos v. United States*, *supra*, 328 U.S. at 765. The court cannot affirm petitioner's conviction if it is in "grave doubt" as to the error's effect upon the verdict. *Id.* at 764-765.

In this case, trial counsel's omissions undoubtedly prejudiced petitioner. As previously noted, proof of such prejudice requires the showing of a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, *supra*, 466 U.S. at 694. In the context of ineffective representation, a petitioner can establish prejudice "even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Ibid.*; see also *Hoffman v. Arave*, 236 F.3d 523 (9th Cir. 2006). "The benchmark for judging any claim of ineffectiveness must be

1    whether counsel's conduct so undermined the proper functioning of the adversarial process
2    that the trial cannot be relied on as having produced a just result." *Strickland, supra,* 466 U.S.
3    at 686.

4        In applying this standard of prejudice, this Court should ask whether the record and
5    the instant petition demonstrate that if counsel had  obtained the services of a knife expert,
6    provided a demonstration of the knife's operation, objected to the submission of the exhibit
7    in a packaged format and objected to the prosecutor's improper argument, the "defense
8    would have been significantly stronger." *People v. Williams,* 44 Cal.3d 883, 946 (1988). For
9    a number of reasons, counsel's effectiveness in such areas would have significantly
10    strengthened the defense case.

11        But for counsel's omissions, the jury would have witnessed a demonstration of how
12    the knife could be opened with one hand. It also would have heard an expert explaining other
13    features of the knife and responding to presumably probing questions about its operation. The
14    prosecutor's unfounded assertion during argument that Gonzales was a liar because it was
15    impossible to open the knife with one hand as he claimed would not have gone unchallenged.
16    And, if any jurors nevertheless continued to question the physical possibility of Gonzales'
17    claim,  the knife would have been submitted into evidence in a manner which would have
18    enabled them to determine for themselves if it could be opened with one hand.

19        While it is impossible to know how the jury would have perceived the demonstration,
20    whether it would have availed itself of the opportunity to experiment with an unpackaged
21    knife or what the results of such experimentation might have been, such speculation as to end
22    results is not, and cannot be, the standard for purposes of assessing the prejudice stemming
23    from counsel's ineffectiveness. Requiring a showing of such ultimately unknowable variables
24    would make a demonstration of prejudice a virtual impossibility in any case involving errors
25    of this nature. Cf. *People v. Santamaria,* 229 Cal.App.3d 269, 282   (1991)  [where jury
26    deliberations improperly adjourned for substantial time, common sense and experience

27
28    Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
    Corpus                        40

1    suggest jurors came into contact with people during that period but requiring proof any jurors

2    improperly discussed merits of case would present an impossible task and no such showing

3    required to establish prejudice]; *Puritan Ins. Co. v. Superior Court*, 171 Cal.App.3d 877,

4    886, fn. 9 (1985) [noting "it would often be impossible for a party to prove he was prejudiced

5    by not learning what he hasn't learned and doesn't know. The law requires neither the

6    impossible nor idle acts which attempt it."].

7        Rather, the pertinent question is whether the defense would have been significantly

8    stronger but for the omissions and therefore whether confidence in the outcome is

9    undermined because counsel's ineffectiveness resulted in (a) the presentation of an

10    incomplete defense (i.e., one without a demonstration or expert testimony), (b) the knife

11    going into the jury room in packaging, and with accompanying comments from the court,

12    which effectively discouraged the jury from testing its opening mechanism for itself; and ©

13    an improper argument which went unchallenged.

14        With the question thus properly framed, one can readily see that counsel's omissions

15    undermine confidence in the verdict which the jury reached below and therefore had a

16    "substantial and injurious effect" on the verdict. This was a close case in which considerable

17    evidence strongly supported Gonzales' claim that he acted in self-defense. His own

18    testimony, and that of Escamilla's as well, that he had been attacked and was being beaten

19    up while at the bottom of a pile of four to six angry party guests (7 RT 978, 1049-1050

20    [Gonzales]; 9 RT 1314 [Escamilla]) was supported by the reports several witnesses made to

21    police close to the time of the incident.

22        In two separate interviews, Kenzler told police that Quiroz started punching Gonzales

23    and then five to six people jumped on him and were kicking and hitting him in a big dog pile.

24    (5 RT 756-757, 759-760, 763-764, 766, 768-769; 8 RT 1136-1138; 3 CT 448-451.)

25        Similarly, when police interviewed Sicklesteel on the morning of the incident, he

26    described seeing a pile of people. (7 RT 950-952.) While it does not appear that Sicklesteel

27

28

1  specifically said he saw Gonzales at the bottom of the pile, the uncontradicted testimony of

2  numerous witnesses describing a large number of angry people cursing and yelling at

3  Gonzales to leave before the major outbreak of brawling by the gate could have left no doubt

4  with the jury that Gonzales was the focus of the crowd's anger. Hence, he was indisputably

5  the most likely and logical target of the pile of people which Sicklesteel observed.

6      In this same vein, Justin Thomas testified that he tried to break up fighting between

7  Gonzales and a group of people which included Ramirez and Guinn and that he grabbed

8  Gonzales by the shirt and pushed him into the street because it appeared that Gonzales had

9  been "hit a few times" and *"the fight was directed towards him...."* (6 RT 831-833; emphasis

10 added.) While Thomas did not see the start of the rumble or who threw the first punch, he

11 saw five or six people facing Gonzales within arm's length of him, a step or two away, and

12 then heard a rush of movement or commotion. (6 RT 852-853.) Once again, since the

13 crowd's anger was obviously directed at Gonzales, it is most logical and reasonable to infer

14 that he, and not Quiroz, was the person initially attacked and the one who would have ended

15 up under a pile of five or six bodies, just as he described on the stand.

16     While both Kenzler and, to a lesser extent, Sicklesteel, disavowed their statements to

17 police by the time they testified at trial, it is difficult to see how reasonable jurors could have

18 accorded much credence to their revised stories since both witnesses had obvious reasons to

19 be biased against Gonzales. Kenzler considered himself a good friend of Largent's and said

20 he spoke to him right after the incident. (5 RT 767.) He had attended Largent's previous

21 parties and felt comfortable enough to invite others to them, including Morales. (4 RT 359.)

22 Sicklesteel had attended high school with a large majority of the party guests (7 RT 942),

23 including both Largent and Quiroz. (4 RT 297, 302.) Largent considered both Kenzler and

24 Sicklesteel friends, although he also described Kenzler as an acquaintance who used to work

25 out with him at the gym. (4 RT 359, 372.)

26

27

28

1    Since both men were friends of Largent and/or Quiroz, as well as with others in the

2    wider social circle of former classmates and frequent attendees of Largent's parties, and since

3    neither had any prior relationship whatsoever with Gonzales, they had an obvious and natural

4    reason to harbor a bias which could have led them to alter their initial stories by the time they

5    got to trial rather than alienate their friends. Kenzler, in particular, might very well have felt

6    indirectly responsible for Quiroz' death since his invitation to Morales had resulted in the

7    unintended consequence of Gonzales also attending the party. As a result, feelings of guilt

8    or anger toward Gonzales could have compounded a natural tendency to try to shade his story

9    to help his friends and blame the stranger whose actions had hardly endeared him to that

10   social circle.

11    Thus, it is reasonably probable that the jury would have considered the prior

12   statements of such witnesses more worthy of belief than their revised testimony.

13    Sicklesteel conceded that his memory was fresher when he spoke to police than when

14   he testified at trial and denied seeing a bunch of people on the ground. (7 RT 951.)

15    Kenzler was less forthright. He went to great lengths to repudiate his former

16   statements. Nonetheless, his claim that he only told police that Quiroz started the fighting

17   based on what he had heard and that he had presumed Gonzales had been attacked since he

18   had heard that Gonzales had hit Largent over the head with a beer bottle (5 RT 774-776)

19   could hardly have seemed credible in light of the detailed description of the fighting which

20   he provided to police shortly after the event. (See 3 CT 448-451.) In those interviews,

21   Kenzler was clearly describing events that he *saw*, not what he had heard from others.

22    Consider the following exchange from the interview conducted on May 25, 2004, two

23   days after the incident:

24        "PULLIAM: Okay. ***What about the guy with the ponytail? [i.e. Gonzales]***

25        KENZLER: Um, I guess, he – he was – I don't now if he was in
26        it, but everybody was pointing towards him and telling him he

27   Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
28   Corpus                                    43

1    has to leave, he has to get out of here, you know, it's time for
     you to go. And so he was by the gate, but he was sort of just
2    standing there.

3    PULLIAM: Okay. So everybody was pointing to him and said
     he had to leave?

4
     KENZLER: Not sort of pointing, but just, like, you know, out of
5    everyone they're like, yeah, you have to go, you have to leave.

6    PULLIAM: Okay.

7    KENZLER: And so he wasn't really, you know, *he was just
     standing there, and the guy, David [Quiroz]*, the – the one that
8    got stabbed –

9    PULLIAM: Okay.

10   KENZLER: *– he went up to him, he's all, 'You're going to
     have to leave.' Right when he said that, he started punching
11   him.*

12   PULLIAM: Okay. Hang on one second. So – so David went up
     to the ponytail guy –
13
     KENZLER: Um- hum.
14
     PULLIAM: – and said, had – he said he had to leave?
15
     KENZLER: Exactly
16
     PULLIAM: And he said – who started punching who [sic]?
17
     KENZLER: Um, *David, started punching the – the guy with
18   the ponytail, and shortly after that, maybe about five or six
     people jumped on him, and that guy was, you know, on the
19   ground, you know, just getting, you know, beat.*

20   PULLIAM: *Who – who got jumped on?*

21   KENZLER: *The guy with the ponytail.* And so there were –
     there were fights breaking out everywhere. I was, like, right on
22   the other side of the gate, and there was a fight, like, right, you
     know, that's where they were punching him, and I was just
23   seeing, you know, there was fights in the driveway, fights were
     getting pushed out to the street. ... So I – *I saw him fall down,
24   um, he was just trying to, you know, to survive, you know,* keep
     his, you know, he didn't really know what was going on.
25
     PULLIAM: Okay.
26

27

PULLIAM: So you're saying that David started punching the ponytail guy first?

KENZLER: Um-hum.

PULLIAM: Okay? *Did the ponytail guy punch back at all?*

KENZLER: The – *he didn't have a chance, maybe about five or six other people just went right after David, but it just all started kickin' and, you know, kicking and punching him.* I don't think he had – that's where I was sort of confused, um, of what happened that –

PULLIAM: *So the ponytail guy didn't have a chance to hit David at all?*

KENZLER: *I don't think he did at all.* He – he might have, but I – I highly doubt that, you know, he could have. *Because once he punched him, you know, all those other people came on him too. You know, when someone – so many people punch the one person, they fall down .*" (3 CT 448-449; emphasis added.)

In addition to the prior inconsistent statements which supported appellant's version of events, it is important to consider that the witnesses who claimed to see appellant attack Quiroz were all directly involved in the brawling and could have faced criminal charges themselves for assaulting Gonzales. All of the five witnesses who described Gonzales as the aggressor were themselves involved in the fighting: Danny Ramirez, Justin Guinn, Daniel Rollis, Scott Largent, and Justin Thomas. Of these five, only Thomas provided testimony that supported the defense version of events. For this reason, no doubt, he was the only one of the five not called to testify by the prosecution despite his direct involvement in the fighting.

Not only did the other four combatants all provide accounts which were contradicted by the original statements given to police by non-combatants Kenzler and Sicklesteel, but these four men were all friends of each other, and especially of Largent and Quiroz, with many of their relationships going back at least to high school. (4 RT 503-504 [Ramirez]; 5 RT 578 [Guinn]; 622-623, 634 [Rollis]; see also 4 RT 297, 342-343 [most attendees were long time friends and a lot of them went to high school together]; 2 RT 121 [same].) As such,

1  they would have had ample motivation to seek to cast blame on Gonzales in order to absolve

2  themselves of any responsibility for the evening's tragic events.

3       While petitioner does not maintain that these witnesses necessarily tried to testify from

4  a common script, it is interesting to note that police gave them an unusual opportunity to

5  confer with each other right after the event and before giving their statements. According

6  to Largent, the ones involved in the fight, such as himself, Guinn and Thomas, "all hopped

7  in" a police car and went down to the station that night. (4 RT 369.)[14] Police also put two or

8  three people in each conference room, placing Largent with Thomas and possibly Guinn. (4

9  RT 370.)

10      Moreover, of the four, only Ramirez and Guinn actually claimed to see Gonzales

11  attack Quiroz. Yet these two were in the thick of the fight themselves and were therefore very

12  likely among the group of five or six who piled on to Gonzales. Interestingly, neither one

13  claimed they ever saw Gonzales using a knife. (4 RT 514 Ramirez]; 5 RT 595 [Guinn].)

14  Their inability to see a knife would make more sense if they were somewhere in the dog pile

15  on top of Gonzales rather than looking at him holding and punching Quiroz against a wall

16  as they claimed.

17      Respondent might argue that Ramirez and Guinn could have embellished their stories

18  by claiming to have seen the knife if they were lying and determined to frame Gonzales, and

19  therefore their omission of that claim makes their testimony more credible. However, it is

20  also possible that they felt it necessary to be truthful in this detail, based on their lack of

21  observation of a knife while in the dog pile, rather than embellish, because they were

22  planning to claim falsely, as they testified, that Gonzales and Escamilla jumped Quiroz and

23  

---

24  [14] While Largent said that multiple cars were used, he was specifically asked if the witnesses
    were together in a single car and replied, "We were in detective cars. There was, you know, piled
25  in those. I think there was four or five of us. One – another detective car we all got into." (4 RT
26  369.) Thus, even though multiple cars were used, it appears that four or five people "piled in"
    each car.

27  

28  Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
    Corpus                                              46

1 therefore could not be certain whether or not the police might have other information about
2 who had used a knife, such as fingerprints, which might undermine their credibility.

3     In any event, this was not so much a situation, in petitioner's view, where any of the
4 "gang of four" combatants were consciously trying to frame him as much as one where their
5 natural instincts as a close-knit group of friends, as well as co-belligerents primarily
6 interested in avoiding prosecution, would have led them to close ranks and try to blame the
7 outsider rather than accept responsibility for the consequences of their own brutish actions.

8     In this regard, the history of brawls breaking out at Largent's keg parties is also
9 pertinent because it showed that fighting was a customary party sport for Largent and his
10 cohorts. Largent's girlfriend, Carol Holmboe, told police she had seen him and his friends
11 "fight a lot, but not like every night." (4 RT 479.) She then explained that she had seen them
12 fight before, though not at *every* party, and what she meant was that "it's the type of group
13 where if one gets in a fight they'll have each other's backs." (4 RT 479.) Such a history of
14 fisticuffs would have supported an inference favoring Gonzales' version of events since
15 piling up on an outsider with the audacity to have fought with the birthday boy would be one
16 way for them to have had "each other's backs" that night.

17     Admittedly, it is possible the Largent contingent also would have rallied to Quiroz'
18 aid if Gonzales and Escamilla had jumped him, as the People claimed. However, the People's
19 theory of the case did not merely suffer from a paucity of evidence that this was what
20 happened. Their scenario simply made little sense given the broader context within which
21 the fighting occurred. Why would either of the two defendants, confronted by an angry crowd
22 of people screaming and cursing at them to leave the party, decide to jump Quiroz and stab
23 him to death when literally dozens of his long-time friends were standing right there, able to
24 come to his aid and already in a hostile mood fueled by anger, the earlier fight, and copious
25 amounts of liquor? Common sense argues strongly against the likelihood of such a scenario.

26

27

1    It is hardly surprising then that no one, not even Ramirez and Guinn, actually testified

2    that they saw such an attack or saw who threw the first punch. At most, those two combatants

3    only said they saw Quiroz being pushed toward some bushes and being punched and held

4    against a wall. (4 RT 511, 513-514; 5 RT 588-591.) If that really happened, it seems quite

5    odd that none of the many other guests massed in that same area reported seeing anything of

6    the sort. On the other hand, as noted above, several non-combatant witnesses corroborated

7    Gonzales' version of events.

8        Indeed, the only support the People have previously relied on for their claim that the

9    evidence contradicted Gonzales' version of events was forensic evidence showing that

10   Quiroz suffered eight wounds inflicted in a thrusting rather than slashing manner. (RB 26-

11   27.) However, neither the number nor thrusting nature of the wounds is hardly as significant

12   as respondent asserts.[15] While Gonzales said he was swinging the knife when under the pile

13   and thought he got someone a couple of times (7 RT 980), a closer reading of his testimony,

14   and a consideration of the extremely stressful nature of the situation he had managed to lived

15   through and was trying to recreate in his mind months later while testifying, suggests that the

16   forensic evidence does not convincingly contradict his claim.

17       In recounting his actions with the knife while under the dog pile, Gonzales was often

18   unable to describe precisely what he did or how he did it, even though he managed to convey

19   the general nature of his resistance to the deadly attack. For example, when asked what he

20

21

22   [15]  Admittedly, under other circumstances, forensic evidence showing a victim had been
stabbed eight times would tend to contradict a claim of self-defense, but often such claims are
23   supported only by a defendant's self-serving testimony. Here, as previously shown, a number of
neutral witnesses with no reason to favor Gonzales (and good reason to be biased against him)
24   told police that they saw a pile of people on top of him, just as he himself claimed. Moreover, the
entire sweep of events from the beginning of the fighting with Largent through the gathering of a
25   hostile crowd intent on getting Gonzales to leave would tend to suggest that he, not Quiroz, was
the person under attack and confronted with a need to defend himself.
26

27

28   Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
Corpus                                                48

did with the knife, he replied, "I started swinging. Panickly [sic]." (7 RT 980.) Though he did say he was swinging the knife, not thrusting it, he also said he did so in a panic, which would make sense given the situation. Also, after saying that he "did get somebody a couple of times," he immediately added: "I had no idea how many or what." (7 RT 980.) Later on, he answered in the negative when asked if he knew how many people he had hit with the knife. (7 RT 1051.) When cross-examined, he did not dispute that he must have stabbed Quiroz eight times. Instead he explained his contrary testimony by candidly saying: "That's all I could recall is I got him at least a couple times." (7 RT 1075-1076.) Pressed further by the prosecutor, the following exchange illustrates the spirit of his testimony:

> "Q. Are you telling us you can't recall more than two times?
>
> A. No. I know I swung more than two times definitely. But I just specifically remember actually thinking I actually got him two times.
>
> Q. That's your testimony, that's your best recall, you stabbed him two times.
>
> A. Yes, I know that he got stabbed more.
>
> Q. How do you explain that, [sic] there are eight stab wounds on this man?
>
> A. I couldn't give you a real good explanation other than I panicked and I was swinging." (7 RT 1076.)

Shortly thereafter, Gonzales provided the following account:

> "In the bush, well, when I got knocked into the bush then I got my knife. As I was getting beat on, he's short, and I somehow got it out. I got it out successfully, I can't tell you how I did that. But I did obviously and I swung, paranoidly [sic] out of fear, paranoid and just terrified. I couldn't tell you when I stabbed him, I was too busy getting pounded on. I couldn't tell you where I was at, where he was at, it was way too dark. I couldn't see people's positions." (7 RT 1078.)

Clearly, Gonzales' ability to recount the exact details of what he did during the fight was imperfect. However, his uncertainty would seem understandable as a matter of common

1    sense. A person fighting for his life in a dangerous situation is unlikely to observe or

2    remember accurately and precisely everything that transpired. Therefore, even though he

3    might have come away thinking he had swung the knife and only got someone "a couple of

4    times," it is entirely possible and consistent with the forensic evidence that he was actually

5    stabbing wildly and madly in a frenzy of thrusts and swings at different body parts of the

6    person on top of him in order to get himself out from under the pile. Such a struggle could

7    easily have resulted in the numerous stab wounds observed on various areas of Quiroz' body,

8    especially if he was the leader of the attackers and the first one on top of Gonzales.

9        Thus, in light of the chaotic circumstances which characterized the fighting, it would

10   be myopic to fixate on Gonzales' use of the term "swinging" the knife as significant evidence

11   which is somehow contradicted by the coroner's finding that stabbing wounds rather than

12   slashing wounds were inflicted. It does not appear that Gonzales really knew how, what type

13   or how many wounds were inflicted, just that he "got somebody."

14       Also, respondent conveniently ignores other aspects of the forensic evidence which

15   either favored neither side or were more favorable to the defense theory. As to the former,

16   the pathologist indicated that he could not determine Quiroz' body position from his wounds.

17   (3 RT 254.) Since Quiroz could have been either standing or lying on top of someone else

18   when the wounds were inflicted (3 RT 254), this aspect of the evidence did not contradict

19   Gonzales.

20       The pathologist also agreed, based on the direction of the wounds, that it was possible

21   the person with the knife came from over the top or the side if Quiroz was on top of him and

22   holding him down and that wounds showing movement could have resulted from thrashing

23   about by either Quiroz, the stabber or both of them. (3 RT 250-251.) A thrashing scenario

24   with Quiroz on top would be  particularly consistent with Gonzales' testimony.

25       Finally, the pathologist did not see the types of hand injuries which might occur in a

26   fist fight or which would suggest Quiroz was  trying to ward off an attacker. (3 RT 230-231,

27

28   Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
     Corpus                                   50

1    248-249.) This finding tended to contradict the People's theory that Quiroz was jumped and

2    stabbed by Gonzales and Escamilla. If he had been subjected to such an attack, one would

3    expect to see such defensive hand wounds, but none were visible. On the other hand, Quiroz

4    would not have had any wounds to his hands if he had been holding someone else down with

5    them. (3 RT 251) Since that is precisely what he would have been doing if he had attacked

6    Gonzales and was the first of many to pile on top of him,  the absence of hand injuries not

7    only undercuts the prosecution's theory but supports the defense theory of the case.

8         Viewed in their totality, the foregoing considerations indicate that petitioner's case,

9    which was already a close one, would have been strengthened considerably if his trial

10   attorney had taken the various measures discussed above. Consequently, her lack of adequate

11   preparation, consultation with and use of an appropriate expert and failure to object either

12   to the improper argument or to the  court's decision with respect to submission of the knife

13   as an exhibit, resulted in a level of representation which undermines one's confidence in the

14   outcome of the case.

15        Accordingly, counsel's ineffectiveness had a substantial, injurious effect which

16   undermines confidence in the verdict,  and this court should grant the instant petition for writ

17   of habeas corpus and reverse his conviction.

18

19

20

21

22

23

24

25

26

27

1

## **CONCLUSION**

2      For all of the foregoing reasons, this court should grant habeas corpus relief, reverse

3  appellant's convictions, and grant such further relief as it may deem just and proper.

4

5  DATED: July 7, 2008                          Respectfully submitted,

6

7

8                                               STEVEN SCHORR, ESQ.
                                                Attorney for Petitioner
9                                               Anthony Gonzales

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27
Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
28  Corpus                                 52

## DECLARATION OF STEVEN SCHORR

I, Steven Schorr, declare:

1. I am an attorney licensed to practice by the State of California and admitted to practice before all of the courts of the State of California. My state bar number is 126312. I previously represented Anthony Daniel Gonzales, the petitioner in the Petition for Writ of Habeas Corpus filed herein, under appointment by the California Court of Appeal, Sixth Appellate District, and in association with the Sixth District Appellate Program.

2. I have prepared and verified the aforementioned Petition on behalf of my client, who is presently incarcerated in California State Prison - Solano in Vacaville, California and who is therefore incapable of doing so himself.

3. I have reviewed the Petition and find that all of the statements made therein are true, except for those statements made upon information and belief, and as to those statements, I believe them to be true.

4. Contemporaneously with the filing of said Petition, I have filed with the United States District Court for the Northern District of California a "Motion for Appointment of Counsel" and petitioner's "Prisoner's Application to Proceed In Forma Pauperis."

5. The Declaration of Chris Mattison,  attached to the Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus as Exhibit A thereto, is a true and correct copy of the Declaration originally filed in the California Court of Appeal.

6. The Declaration of Vicki Firstman,  attached to the Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus as Exhibit B thereto, is a true and correct copy of the Declaration originally filed in the California Court of Appeal.

7. The Declaration of Bernard Levine,  attached to the Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus as Exhibit C thereto, is a true and correct copy of the Declaration originally filed in the California Court of Appeal.

8. The Supplemental Declaration of Chris Mattison, attached to the Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus as Exhibit D thereto, is a true and correct copy of the Declaration originally filed in the California Court of Appeal.

9. The five photographs, attached to the Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus as Exhibit E thereto, are true and correct copies of the photographs referred to in paragraph 5 of the Declaration of Vicki Firstman (see Exhibit B) and originally filed in the California Court of Appeal. It is my opinion, based on information and belief, paragraphs 4 and 5 of said Declaration and the record in the instant case, that these photographs depict the knife entered into evidence at trial as People's Exhibit 16 and depict it in the manner in which it was packaged for submission to the jury.

10. The page containing two photographs, attached to the Memorandum of Points and Authorities in Support of Petition for Writ of Habeas Corpus as Exhibit F thereto, is a true and correct copy of a page originally filed in the California Court of Appeal. I discovered the page while examining the files of petitioner's trial counsel during the preparation of the Petition for Writ of Habeas Corpus originally filed in the California Court of Appeal. Based on the date stamped thereon, May 24, 2004, which is the day after the occurrence of the incident at issue in the instant case, the record in the instant case, a visual comparison of the knife depicted in said photographs with the photographs referred to in paragraph 9 above, and on information and belief, it is my opinion that these photographs depict the knife ultimately entered into evidence as People's Exhibit 16 as it appeared when taken into evidence by the police.

///

///

///

///

1    I declare under penalty of perjury under the laws of the State of California that all of

2  the foregoing is true and correct to the best of my knowledge and belief.

3    Executed this 7th  day of July, 2008 at San Diego, California.

4

5

STEVEN SCHORR, ESQ.
6                                    Attorney at Law
                                    Attorney for Petitioner
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27
Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
28  Corpus                                    55

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>-vs-<br><br>ANTHONY GONZALES,<br><br>Defendant. | No. _____<br><br>Related Appeal<br>No. HO29399<br><br>(Santa Clara County<br>  Superior Court No. CC454539) |

## DECLARATION OF CHRIS MATTISON

1. I, Chris Mattison, am an attorney licensed to practice law in the State of California. I am a deputy alternate defender in the Law Offices of the Alternate Defender for Santa Clara County.

2. I represented Anthony Gonzales as trial counsel in the above-referenced case.

3. At trial, I knew that my client planned on testifying in his own behalf and that he would testify that he had a folding knife in the front pocket of his pants and that, when a mob of men fell on him and were kicking and hitting him, he was able to remove the knife from his pocket, open it using one hand and use it in self-defense.

1

4. During my client's testimony, I did not ask him to demonstrate to the jury how he could have opened his knife with one hand. This was an oversight on my part and not a trial tactic.

5. After the completion of my client's testimony, I informed the court that I would be asking to have the knife involved in the incident, which had been marked as an exhibit, physically given to the jury so the jurors could manually operate it and verify or not his testimony that the knife could be easily opened with one hand because it had a "roll-up" knob. This request was made informally right after the jury left the courtroom for the noon break. I do not recall if the district attorney made any comments or any other discussion regarding the request.

6. Upon returning to the court at the end of the noon recess, the Judge took the bench without coming out beforehand. He proceeded to make a statement to the jury that the knife in question would be provided to them, but that it would remain in sealed packaging. The Judge immediately moved on to the next stage in the proceeding, and I took this to mean my request was summarily denied. I did not have a tactical reason for refraining from objecting or seeking to renew the issue later on the record. I believed the Judge had already decided the issue, and that it would be futile to ask him to reconsider his position.

7. It did not occur to me until after the trial that I could have consulted an expert witness on knives and called him to testify and demonstrate how the knife could be manipulated and opened with one hand. If I had thought of this option, I would have

2

pursued it. I did not have a tactical reason for not consulting a knife expert and/or calling him to testify.

8. Also, even if I had been unable to obtain funding to retain a knife expert, I could have, with little expense or difficulty, asked my investigator, John Vegas, to obtain the identical make and model of the subject knife, and I could have offered to call him to the stand with this knife to demonstrate the actions to which my client had testified. I did not have a tactical reason for failing to have Mr. Vegas ready to testify with a replica knife, in the event I was unable to have Mr. Gonzales provide such a demonstration.

The foregoing is true and accurate, and stated under penalty of perjury.

Dated: October 24, 2006.

CHRISTINE MATTISON,
Alternate Defender's Office
Trial Counsel for Anthony Gonzales

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff and Respondent,<br><br>vs.<br><br>ANTHONY DANIEL GONZALES,<br><br>Defendant and Appellant. | No. _____<br><br>Related Appeal<br>No. H029399<br><br>(Santa Clara County<br>Superior Court No.<br>CC454539 ) |

## DECLARATION OF VICKI FIRSTMAN

1.      I, Vicki Firstman, am an attorney licensed to practice law in the State of California. I am a staff attorney with the Sixth District Appellate Program (SDAP).

2.      On October 5, 2005, the Sixth District Court of Appeal issued an order appointing SDAP to represent Anthony Gonzales in the above-referenced appeal.

3.      On October 20, 2005, SDAP informed the Court of Appeal of its wish to associate with panel attorney Steven Schorr for purposes of representing Mr. Gonzales on appeal.

4.      On July 5, 2006, after discussions and consultation with Mr. Schorr, I went to the exhibit room of the Santa Clara County Superior Court to examine the knife presently retained as evidence in Mr. Gonzales' case. My purpose in examining the knife was to determine whether the knife could be opened with one hand.

5.      The Superior Court clerk brought out the knife, which was enclosed in

sealed plastic packaging. I took several photographs of the knife, which are contained in Exhibit D of the attached habeas petition.

6.     I am not experienced with knives used for hunting or as weapons and consider myself a "layperson" in this regard.

7.     The knife, as I observed it, was in an open position. There was what I presumed to be dried blood present on the knife blade. Though I attempted to manipulate the knife within the packaging, the blade appeared to be locked in the open position, and the knife itself could not be easily moved within the packaging.

8.     Based on my examination of the knife, and unaware of the presence of the mechanisms described by Mr. Levine in his declaration, my impression was that the knife probably could not be opened with one hand, though I was unsure if that impression was correct.

9.     Having since read the attached declaration of Bernard Levine, I now realize that given my lack of experience with similar knives, that I was in no position to determine whether this was a one-hand opening knife absent the assistance of either an expert or someone familiar with this type of knife. I did not recognize the presence or purpose of the thumb stud described by Mr. Levine and had no idea how to unlock and close the blade or to then attempt to reopen it. Being completely unfamiliar with the locking liner and thumb stud described by Mr. Levine, and taking into account the additional difficulty of handling the knife inside the sealed packaging, I came away from the exhibit room unsure whether the knife could be opened with one hand, but with the impression that it probably was not a one-hand opening knife..

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of December, 2006, at Santa Clara, California.

Vicki Firstman

2

# DECLARATION OF BERNARD LEVINE

I, Bernard Levine, do hereby declare:

1. I am an expert on knives, having worked in the field for 35 years. During the past 26 years, I have testified approximately 30 times as an expert witness in both federal and state courts, including a number of times before Santa Clara County courts (e.g., *People v. Tung Phi Dau* (May 1985), on behalf of the prosecution; *People v. James G. Krepps* (October 1983), on behalf of the defense). In addition to providing expert testimony for both the prosecution and the defense in criminal cases, I have been retained for consultations by attorneys, including prosecutors, as well as police departments and insurance adjusters in more than a dozen states. I have authored ten books in the field of knives and knife collecting, including four editions of the standard reference work in the field, Levine's Guide to Knives and Their Values (1985, 1989, 1993, 1997); Pocketknives, a Collector's Guide (1993); Knifemakers of Old San Francisco (1978; 2d ed. 1998) and Identifying Pocketknives (1998). As a frequent contributor to *Blade Magazine* since 1974, *Knife World* since 1977, and *Knives Illustrated* since 1996, I have published more than 500 feature articles on knives in these and other periodicals. I have also served as an advisor and consultant on the history and technology of cutlery to the Smithsonian Institution's National Museum of American

1

History, to the California Academy of Sciences and to other leading museums.

2. At the request of Steven Schorr, counsel for appellant Anthony Gonzales in the pending case of People v. Anthony Gonzales, Court of Appeal Case Number H029399, I have examined six photographs of the knife presently retained as evidence in said case. Mr. Schorr has informed me that two of the photographs presumably depict the knife as it appeared when collected as evidence from the crime scene by the police since these two photographs, which appear together on a single page and which each depict a single side of the knife, are date stamped   May 24, 2004, the day after the incident at issue. He further informs me that the remaining four snapshots were taken by Vicki Firstman, staff attorney for the Sixth District Appellate Program and appellant's co-counsel in said case, in the exhibit room of the Santa Clara County Superior Court and that such photographs depict the knife as it presently appears in the sealed packaging in which it was ordered placed by the court during the trial for purposes of submission to the jury.

3. Based upon my examination of the photographs, I have reached certain conclusions regarding the knife as stated further below.

4. It is possible to open this type of knife with one hand, although only with the right hand. The blade is fitted with a "thumb stud," a small projecting metal knob near its base, on the front or "mark" side of the knife. This thumb stud is clearly visible in the bottom of the

two photos dated May 24 2004, in line with the 7-1/8 inch marking on the ruler. When the knife is closed, and gripped in the user's right hand, the thumb stud is conveniently located to place the tip of the thumb on it. It is then a simple matter to pivot the blade open by pushing laterally with the thumb. Some one-hand opening knives of this type are ambidextrous, with studs on both sides, but this particular knife is right-handed.

5. In knife shops, at knife shows, and in other situations, I have observed a variety of "laypersons" encountering thumb studs (as on this knife), locking liners (as on this knife), and other knife novelties for the first time. Some people grasp the use and function of the thumb stud and the locking liner immediately, although they usually require some practice to use them smoothly and confidently. Others, possibly a majority, do not figure out these mechanisms on their own -- for example, they do not realize that the stud has a function, or do not even notice that it is present.

6. People who do not recognize the presence or purpose of the thumb stud, or who do not work out on their own how to operate it, typically turn for help to a salesperson, or other person already familiar with this type of knife. Often one-hand opening knives with thumb studs come from the factory with a printed diagram or instructions, showing or explaining how to open the blade.

7. Similarly, laypersons encountering a locking liner mechanism for the first time

3

often cannot work out how to unlock and close the blade, and turn for help to someone more experienced. To release this type of lock, one must push laterally against the liner with finger or thumb, down in the concave handle cut-out centered at the 8-1/2 inch marking on the ruler in the bottom of the two photos dated May 24 2004. The lock mechanism is not visible in any of the photos. I suspect it would be difficult to release this lock through the plastic bag, but I could only determine this through direct examination.

8. I have examined the four photographs of the knife in a plastic bag. The knife appears to be in the fully open position, with the blade locked open. There is what appears to be dried blood visible on the outside of the knife, so I suspect there is also dried blood inside it. Without direct examination and handling of the knife in the bag, I cannot tell if it is possible to unlock and close the blade, or if either the bag, or the dried blood, would prevent this. Dried blood in the mechanism might prevent the blade from moving at all. The plastic bag, being slippery, might impede closing and re-opening the blade, particularly one-hand opening of the blade by use of the thumb stud. Without the ability to close, then re-open the blade, it would be impossible for a person to determine whether or not this particular knife can now be opened with one hand, as it was evidently designed to be opened. For a person unfamiliar with the locking liner and thumb stud mechanisms, having to handle the knife inside the bag would likely compound their difficulties.

4

9. Alternatively, I could examine an exemplar knife of the same type as the incident knife, if I can locate such a knife; however, strict comparability of an exemplar can be compromised if the subject knife had been tightened, loosened, worn, or otherwise modified.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Eugene, Oregon on *October 3*, 2006.

*Bernard Levine*

BERNARD LEVINE

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>                              Plaintiff,<br><br>              -vs-<br><br>ANTHONY GONZALES,<br><br>                              Defendant. | No. H031002<br><br>Related Appeal<br>No. HO29399<br><br>(Santa Clara County<br>  Superior Court No. CC454539) |

**SUPPLEMENTAL DECLARATION OF CHRISTINE MATTISON**

1. I, Christine Mattison, am an attorney licensed to practice law in the State of California. I am a deputy alternate defender in the Law Offices of the Alternate Defender for Santa Clara County.

2. I represented Anthony Gonzales as trial counsel in the above-referenced case.

3. During the prosecutor's closing argument at trial, I heard the prosecutor argue that two hands were needed to open the folding knife involved in the homicide and that my client had lied during his testimony by claiming he had opened the knife with one hand.

4. Although I did not recall any testimony or other evidence in support of the

1

prosecutor's argument regarding the knife, I did not object on grounds that he had committed misconduct by arguing facts outside the evidence or on any other grounds.

5. My failure to make a technical objection as to "facts not in evidence" is unexcused, as I should have objected thusly in addition to arguing it in my response in my closing which I did. I did not have a tactical reason for refraining which would have allowed an additional admonishment from the court to the jury, telling them to disregard that aspect of the prosecutor's argument.

The foregoing is true and accurate, and stated under penalty of perjury.

Dated:   February 6, 2007.


CHRISTINE MATTISON,
Alternate Defender's Office
Trial Counsel for Anthony Gonzales

2

**1**



**2**



**3**

**4**

**5**





Case Number: **2004-2115**
Incident Number: 20040523006

1  **STEVEN SCHORR**
   **ATTORNEY AND COUNSELOR**
2  **P.O. BOX 910496**
   **SAN DIEGO, CA 92191-0496**
3  **STATE BAR NO. 126312**

4              DECLARATION OF SERVICE **BY MAIL**

5  **CASE NAME:** People v. Anthony Daniel Gonzales                **NO.:**

6  I am a citizen of the United States, over 18 years of age, employed in the County of San
   Diego, California, in which county the within-mentioned delivery occurred, and am not a
7  party to the subject cause. My business address is P.O. Box 910496, San Diego, California.

8  I served the MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
   PETITION FOR WRIT OF HABEAS CORPUS, of which a true and correct copy of the
9  document filed in the cause is affixed, by placing a copy thereof in a separate envelope for
   each addressee named hereafter, addressed to each such addressee respectively as follows:

10
   Office of the Attorney General          James E. Tilton, Secretary
11 455 Golden Gate Avenue, Suite 11000     California Department of Corrections
   San Francisco, CA 94102-7004            1515 "S" Street
12 Attn: Jeffrey M. Laurence               Sacramento, CA 95814
   (Deputy Attorney General)
13
   Anthony Daniel Gonzales
14 #V-97347
   California State Prison - Solano
15 P.O. Box 4000
   Vacaville, CA 95696
16

17         Each envelope was then sealed and with the postage thereon fully prepaid deposited
18 in the United States mail by me at San Diego, California on July 11, 2008.
           I declare under penalty of perjury that the foregoing is true and correct. Executed on
19 July 11, 2008 at San Diego, California.

20                                              STEVEN SCHORR

21

22

23

24

25

26

27
   Appellant's Memorandum of Points and Authorities in Support of Petition for Writ of Habeas
28 Corpus